# United States Court of Appeals
## For the First Circuit

No. 17-2218

JOSEPH A. BEBO,

Petitioner, Appellant,

v.

SEAN MEDEIROS, Acting Superintendent,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Elizabeth Prevett, with whom Federal Defender Office was on brief, for petitioner.
Thomas E. Bocian, Assistant Attorney General, Criminal Bureau, with whom Maura Healey, Attorney General of Massachusetts, was on brief, for respondent.

October 3, 2018

**SELYA**, **Circuit Judge**. With respect to federal habeas review of state criminal convictions, Congress has ordained an especially deferential standard of review, which compels us to look only at federal constitutional law as clearly established by the Supreme Court. See 28 U.S.C. § 2254(d)(1). This deferential standard sometimes results in situations in which a state court ruling may be deemed to pass constitutional muster on habeas review even though an identical federal court ruling might be deemed reversible error on direct review under circuit precedent. Thus, the question of what our circuit's case law would suggest is not before us in this habeas case. Based on Supreme Court case law, we conclude that the challenged state court ruling was neither contrary to nor an unreasonable application of clearly established federal law. Consequently, we affirm the district court's dismissal of the habeas petition.

## I. BACKGROUND

We briefly rehearse the facts and travel of the case. On November 14, 2005, petitioner-appellant Joseph A. Bebo took part in a street fight in Brockton, Massachusetts. The fight, which stemmed from a dispute over the price of marijuana, involved two groups: one from Brockton and the other from nearby Stoughton. The petitioner was a member of the Stoughton group, as was Raymond Muse. During the melee, Carl Schirmer (a member of the Brockton

group) was stabbed in the chest. Schirmer later died from his wound and the police charged the petitioner with the murder.

During the petitioner's trial in the state superior court, Muse testified that the petitioner had said that "he might have stabbed somebody and it might have went through." On later questioning, Muse agreed that the petitioner's statement was "to the effect that [he] felt the knife go in." The petitioner did not take the stand. The defense argued, though, that the police had failed to conduct a thorough investigation, and he suggested that Muse was the person responsible for Schirmer's murder. In his summation, the prosecutor cautioned the jury not to get "fooled with [the defense's] classic strategy" of playing "the blame game." The jury accepted the prosecution's version of the incident and found the petitioner guilty of murder in the second degree. See Mass. Gen. Laws ch. 265, § 1. As required by state law, see id. § 2(c), the trial justice sentenced him to life imprisonment.

The day after the jury returned its verdict, the petitioner's attorney went into the jury deliberation room to retrieve a television set. Upon entering the room, he discovered a book on the window ledge. The book, written by Ann Coulter, bore the title Guilty: Liberal "Victims" and Their Assault on America (Guilty). Inside the book was a piece of paper containing the handwritten names of the petitioner's attorney, the prosecutor, and the trial justice.

- 3 -

The "About the Author" page describes Coulter as "[a] graduate of Cornell University and University of Michigan Law School," who "clerked for the Honorable Pasco Bowman II of the U.S. Court of Appeals for the Eighth Circuit, worked for the Senate Judiciary Committee, and served as a litigator with the Center for Individual Rights."  Broadly, the book argues that liberals use false claims of victimhood — both on behalf of themselves and groups such as minorities, the poor, and single mothers — to try to gain the upper hand over conservatives.  For example, in a chapter entitled "Victim of a Crime?  Thank a Single Mother," Coulter asserts that "derelicts and liberals" both "see themselves as the passive victims of circumstances, with no control over their own lives."  She quotes an English doctor writing under the pen name "Theodore Dalrymple" describing how three murderers in a prison used the same passive-voice phrase to attempt to separate themselves from responsibility for their crimes:  "the knife went in."  In Dalrymple's words, "[t]hat the long-hated victims were sought out, and the knives carried to the scene of the crimes, was as nothing compared with the willpower possessed by the inanimate knives themselves, which determined the unfortunate outcome."  Coulter adds, "[i]t's the same thing with battered women who act as if they could not possibly have foreseen the violent tendencies in their boyfriends."

The book also contains a passage disparaging defense attorneys who, according to Coulter, "lie remorselessly on behalf of child murderers, self-righteously informing us that this is 'part of the process.'" At another point, the book discusses the trial of O.J. Simpson, who Coulter declares "got[] away with two heinous murders."

Promptly after finding the book in the jury room, the petitioner's counsel filed a motion in which he asked the court to conduct a jury inquiry on the basis that the book constituted "extraneous" material that could have improperly influenced the jurors' deliberations. After a non-evidentiary hearing, the trial justice denied the motion even though he found that the petitioner had made a "showing . . . that the book did belong to a juror, [and] was brought [to court] by a juror." He grounded his ruling on a conclusion that the book was not "extraneous" material requiring a jury inquiry, and stated that he "fail[ed] to see how the Book related to [the petitioner's] case, the parties involved in [the petitioner's] case, or the issues presented at trial." The trial justice added that the book was a "general political and social commentary from an author who may well be seen by some, or even many, as a provocative right-wing conservative," which was not even arguably relevant, save for "a few isolated passages containing general commentary about defense attorneys that 'lie,'

'violence against women,' . . . references to 'stabbings,' and the O.J. Simpson case."

As an anchor to windward, the trial justice further found that, even if the book could be regarded as "extraneous" material, the petitioner had failed to show that it was considered during the jury deliberations, as jurors are presumed to follow the court's instructions. And the trial justice went on to find that, in all events, there was no prejudice to the petitioner because his case "concerned neither race nor violence against women."

The petitioner appealed both his conviction and the denial of his jury inquiry motion to the Massachusetts Appeals Court (MAC). That appeal proved unavailing, see Commonwealth v. Bebo (Bebo I), 984 N.E.2d 890 (Mass. App. Ct. 2013) (table), full text at 2013 WL 1149504, and the Massachusetts Supreme Judicial Court denied the petitioner's application for leave to obtain further appellate review, see Commonwealth v. Bebo, 987 N.E.2d 594 (Mass. 2013) (table). Undaunted, the petitioner repaired to the federal district court and filed a timely petition for habeas relief, see 28 U.S.C. § 2254, naming as respondent Sean Medeiros, the Acting Superintendent of the state penitentiary at which the petitioner was then incarcerated. The petitioner subsequently filed a motion for an evidentiary hearing, requesting that the federal district court conduct an inquiry of the state-court jury that convicted him. The district court, in a thoughtful rescript,

- 6 -

denied both the petition and the motion. See Bebo v. Medeiros (Bebo II), No. 14-11872, slip op. at 13 (D. Mass. Nov. 13, 2017). At the same time, the court issued a certificate of appealability, see 28 U.S.C. § 2253(c), limited to "whether the book in question is 'extraneous material' entitling Petitioner to a hearing under 'clearly established Federal law,'" Bebo II, slip op. at 13-14. This appeal followed.

## II. ANALYSIS

In this instance, the district court did not hold an evidentiary hearing and, thus, made no independent factual findings. Consequently, our review of the district court's dismissal of the habeas petition is de novo. See Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007).

Under the "peculiarly deferential standards" of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, "error by a state court, without more, is not enough to warrant federal habeas relief." Cronin v. Comm'r of Prob., 783 F.3d 47, 50 (1st Cir. 2015). As relevant here, a state court decision may only be overturned on habeas review if it is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

To be deemed "contrary to clearly established federal law," a state court decision must "announce[] a rule of law that

directly contradicts existing Supreme Court precedent or . . . reach[] a different result than the Supreme Court on materially indistinguishable facts." Cronin, 783 F.3d at 50 (citing Williams v. Taylor, 529 U.S. 362, 412-13 (2000)). An unreasonable application occurs when "the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case." White v. Woodall, 572 U.S. 415, 425 (2014) (quoting Williams, 529 U.S. at 407-08). Federal habeas relief only "provides a remedy for instances in which a state court unreasonably applies [the Supreme] Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." Id. at 426 (emphasis in original).

These standards ensure that federal habeas relief will be granted only in cases in which all fairminded jurists would agree that a final state court decision is at odds with the Supreme Court's existing precedents. See Harrington v. Richter, 562 U.S. 86, 102 (2011). One consequence of this rule is that a federal court sitting in habeas jurisdiction "may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003) (per curiam). This is not to say that the AEDPA "require[s] state and federal courts to wait for some nearly identical factual pattern before a legal rule

must be applied." Panetti v. Quarterman, 551 U.S. 930, 953 (2007)

(quoting Carey v. Musladin, 549 U.S. 70, 81 (2006) (Kennedy, J.,

concurring in judgment)). The Supreme Court has recognized that

"even a general standard may be applied in an unreasonable manner."

Id.

With this foundation in place, we turn to the

underpinnings of the claim at issue here. The Sixth Amendment

guarantees a defendant charged in a criminal case the right to

"trial[] by an impartial jury." U.S. Const. amend. VI. This

"right is made binding upon the states through the fourteenth

amendment" and, thus, applies with full force to state criminal

prosecutions.[1] Neron v. Tierney, 841 F.2d 1197, 1206 (1st Cir.

1988). To ensure that this constitutional guarantee is not an

empty promise, a jury's "verdict must be based upon the evidence

developed at the trial." Irvin v. Dowd, 366 U.S. 717, 722 (1961).

Similarly, the verdict must be "free from external causes tending

to disturb the exercise of deliberate and unbiassed [sic]

judgment." Mattox v. United States, 146 U.S. 140, 149 (1892).

When an "extraneous" influence may have infected a

jury's deliberations, a court may admit juror testimony to impeach

the verdict. Tanner v. United States, 483 U.S. 107, 117 (1987)

---

[1] This guarantee admits of some exceptions. For example, misdemeanors punishable by a term of imprisonment of six months or less do not generate a right to a trial by jury. See United States v. Pina, 844 F.2d 1, 10 (1st Cir. 1988). None of these exceptions, however, is apposite here.

(quoting Mattox, 146 U.S. at 149).  To be considered "extraneous," information must "derive[] from a source 'external' to the jury," such as "publicity and information related specifically to the case the jurors are meant to decide."  Warger v. Shauers, 135 S. Ct. 521, 529 (2014) (citing Tanner, 483 U.S. at 117).  By contrast, evidence regarding internal influences, such as jurors' personal beliefs and experiences, generally may not be used to impeach a verdict.  See id. at 529-30 (excluding evidence that juror lied during voir dire about her daughter's involvement in a motor vehicle accident); Tanner, 483 U.S. at 122 (barring testimony that juror was under the influence of drugs and alcohol during trial); but cf. Peña-Rodriguez v. Colorado, 137 S. Ct. 855, 869 (2017) (finding exception to no impeachment rule "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant").

The Supreme Court has found that external information threatened the integrity of the jury's verdict in only three reported cases:  where a bailiff told jurors that the defendant had killed three people and a newspaper article regarding the case was subsequently read to the jury during deliberations, see Mattox, 146 U.S. at 150-51; where a bribe was offered to a juror and the Federal Bureau of Investigation conducted an inquiry during the trial, see Remmer v. United States, 347 U.S. 227, 228-29 (1954); and where a bailiff commented to a juror on the defendant's guilt

within the hearing of other jurors, see Parker v. Gladden, 385 U.S. 363, 363-64 (1966) (per curiam). In two other cases, the Court found that contact between the jury and external parties could taint the jury's deliberations. See Smith v. Phillips, 455 U.S. 209, 215-16 (1982) (discussing juror's submission of employment application to the district attorney's office); Turner v. Louisiana, 379 U.S. 466, 468, 473-74 (1965) (discussing situation in which deputy sheriffs who were key government witnesses were left in charge of jury, including driving jurors to and from courthouse). In yet another case, the Court reiterated that "a newspaper read inside the jury room" would qualify as "an external influence about which juror testimony is admissible." Tanner, 483 U.S. at 118 (dictum); see infra note 3.

Upon receiving information regarding external "communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury," a trial court must "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." Remmer, 347 U.S. at 229-30. The Supreme Court has cautioned, though, that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith, 455 U.S. at 217. As long as there is "a jury capable and willing to decide the case solely on the evidence before it, and

- 11 -

a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen," due process is not offended.  Id.

This brings us to the matter at hand.  Sugar-coating would serve no useful purpose, and it should be stated at the outset that "[t]he introduction of an extraneous document into the jury room during deliberations is always a cause for concern." United States v. Bradshaw, 281 F.3d 278, 290 (1st Cir. 2002).  This is certainly true where a book entitled Guilty, written by an author with a legal background, was found in the jury room with a note containing the names of the attorneys and the judge involved in the petitioner's trial.  And to make the matter even more dicey, the book contains commentary about defense attorneys lying and murderers disclaiming responsibility for stabbings they committed, using language similar to that attributed to the petitioner by a witness at trial.  Were we considering this case on direct appeal, we might find that the book was "extraneous" material, triggering the trial court's responsibility to make inquiry of the jury.  See, e.g., United States v. Pagán-Romero, 894 F.3d 441, 447 (1st Cir. 2018) (stating that jury, having been given dictionary in jury room, "was exposed improperly to extrinsic material"); United States v. Bristol-Mártir, 570 F.3d 29, 43 (1st Cir. 2009) (finding that definitions of terms obtained from the internet by juror required jury inquiry); United States v. Lara-Ramirez, 519 F.3d

- 12 -

76, 89 (1st Cir. 2008) (finding that trial court had duty to investigate presence of Bible in jury room "just as it would in other situations where extraneous materials have been brought into the jury's deliberations").

Direct review, however, is not the posture in which this case arrives on our doorstep. In the narrowly circumscribed scope of habeas review, we may only grant relief if the last reasoned state court decision was contrary to or an unreasonable application of federal law as determined by the Supreme Court. In the case at hand, the last reasoned state court decision is the MAC's decision in Bebo I. The MAC defined "extraneous" material as "information, knowledge, or specific facts about one of the parties or the matter in litigation that did not come from the evidence at trial." Bebo I, 2013 WL 1149504, at *1. As the district court observed, this definition is almost identical to that used by the Supreme Court: "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury." Remmer, 347 U.S. at 229.[2] In point of fact, the MAC's definition is arguably broader than that of the Supreme Court as it is not limited to "private" actions.

_____

[2] Although the MAC's formulation does not include the phrase "directly or indirectly," there is no reason to believe that its definition of "extraneous" material was meant to exclude information received by jurors indirectly. After all, one of the Massachusetts cases on which the MAC relied quoted the "directly or indirectly" language from Remmer. See Commonwealth v. Dixon, 479 N.E.2d 159, 162 (Mass. 1985).

- 13 -

The crux of this case is whether fairminded jurists could disagree regarding the scope of the phrase "about the matter pending before the jury." Id. Specifically, we must consider whether this phrase reasonably can be interpreted to exclude a book entitled Guilty that disparages defense attorneys in terms somewhat similar to those sounded by the prosecution in closing, discusses criminals trying to evade responsibility for crimes bearing arguable similarity to the crime charged using phraseology reminiscent of that attributed to the petitioner, and attacks liberals' views of the criminal justice system.

In our view, this question turns not on what the Supreme Court has said, but on what it has not said. Remmer and its progeny do not purpose to define the scope of "the matter pending before the jury," nor do those opinions indicate how tight the nexus must be between some particular piece of external material and the facts of the case before the jury. See Joyner v. Barnes, 135 S. Ct. 2643, 2646-47 (2015) (Thomas & Alito, JJ., dissenting from denial of certiorari) (recognizing that Supreme Court case law has not yet provided specific guidance on the scope of "the matter pending before the jury"). By the same token, there is no reported Supreme Court case with facts analogous to the facts of the case at hand.[3]

---

[3] Even though Tanner suggested in dictum that a newspaper found in the jury room would "of course" be "an external influence," the only precedent cited was a case involving a

- 14 -

In an apparent effort to fill this void, the petitioner urges us to consult circuit court precedent, arguing that every circuit confronting the question has found analogous material to be "extraneous" and, therefore, requiring jury inquiry. See, e.g., United States v. Warner, 498 F.3d 666, 678 (7th Cir. 2007) (finding American Judicature Society article regarding substitution of jurors to be "extraneous" material); United States v. Bassler, 651 F.2d 600, 601-02 (8th Cir. 1981) (finding juror's notes on Roberts Rules of Order to be "extraneous" material). We previously have stated that "lower court precedents may provide 'a valuable reference point' when there is some doubt about the meaning or scope of the relevant Supreme Court rule." Coningford v. Rhode Island, 640 F.3d 478, 485 (1st Cir. 2011) (quoting Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002)); see Ouber v. Guarino, 293 F.3d 19, 26 (1st Cir. 2002) (noting that "it is helpful to examine precedents from lower federal courts to determine how the general standard applies to a particular set of facts"). We acknowledged, though, that circuit precedent "may not be used to fill a gap where . . . the Justices have expressly declined to lay down a rule." Coningford, 640 F.3d at 485. The Supreme Court has since clarified that it is never permissible to fill a gap in Supreme Court jurisprudence with circuit court analysis. See Glebe v. Frost,

---

newspaper containing an article regarding the case the jury was deciding. 483 U.S. at 118 (citing United States v. Thomas, 463 F.2d 1061 (7th Cir. 1972)).

- 15 -

135 S. Ct. 429, 431 (2014); Marshall v. Rodgers, 569 U.S. 58, 64 (2013); Parker v. Matthews, 567 U.S. 37, 48 (2012). Instead, circuit court case law is only relevant under habeas review "to ascertain whether [a court of appeals] has already held that the particular point in issue is clearly established by Supreme Court precedent." Marshall, 569 U.S. at 64. Thus, we may not look to circuit precedent "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." Id. Nor may we — as the petitioner invites us to do — "canvass circuit decisions to determine whether a particular rule of law is so widely accepted among Federal Circuits that it would, if presented to [the Supreme] Court, be accepted as correct." Id.

Confining our inquiry, as we must, to the law as articulated by the Supreme Court, we conclude that the MAC's decision that the book did not qualify as "extraneous" material was not objectively unreasonable. Every case in which the Supreme Court has found an "extraneous" influence has involved either communications relating to the specific case sub judice, see Gladden, 385 U.S. 363; Remmer, 347 U.S. 227; Mattox, 146 U.S. 140, or contacts between the jurors and individuals or entities involved in that particular trial, see Smith, 455 U.S. 209; Turner, 379 U.S. 466. In the absence of contrary Supreme Court guidance, a fairminded jurist could find — as did the judges of the MAC — that

- 16 -

a book that offers provocative commentary regarding defendants and defense lawyers and describes crimes bearing some similarity to the one at issue but that does not refer either to the particular defendant or the particular case sub judice, was not "about the matter pending before the jury." Remmer, 347 U.S. at 229. To apply the "extraneous" material doctrine to the facts of this case would be an extension of the rule that has been clearly established by the Supreme Court. And "'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" White, 572 U.S. at 426 (quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)). This remains true even where, as here, the proposed extension is a logical one.

## III. CONCLUSION

We need go no further.[4] For the reasons elucidated above, the judgment of the district court is

**Affirmed.**

---

[4] In view of our holding, we need not reach the petitioner's argument that it was unreasonable for the MAC to conclude that, even if the book could be regarded as "extraneous" material, the petitioner had failed to "make a colorable showing that [it] may have had an impact on the jury's impartiality." Bebo I, 2013 WL 1149504, at *1 (quoting Commonwealth v. Dixon, 479 N.E.2d 159, 161-62 (Mass. 1985)). Nor need we reach the question of whether the appropriate remedy in this case would be, as the petitioner requests, to have a federal habeas court conduct an inquiry of the state-court jury.