# United States Court of Appeals
## For the First Circuit

No. 20-1571

EUNICE FIELD,

Petitioner, Appellant,

v.

ALLISON HALLETT, Superintendent, MCI Framingham,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Thompson, and Gelpí,
Circuit Judges.

Elizabeth Caddick for appellant.
Maria Granik, Assistant Attorney General, with whom Maura
Healey, Attorney General, was on brief, for appellee.

June 14, 2022

**THOMPSON, Circuit Judge.** Petitioner Eunice Field ("Field") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to vacate her conviction for murder in the first degree. The conviction stems from Field fatally stabbing her ex-girlfriend's Alcoholics Anonymous ("AA") sponsor Lorraine Wachsman ("Wachsman") nine times in the head, chest, and neck. After Massachusetts' state courts denied Field's appeal of her conviction and motions for a new trial, see Commonwealth v. Field, 79 N.E.3d 1037 (Mass. 2017), her claims made their way to the United States District Court for the District of Massachusetts, where she sought a writ of habeas corpus via 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). Field contended that her trial counsel failed to provide her with her constitutionally protected right to have effective assistance of counsel, but the district court denied her petition. Field v. Hallett, No. 18-CV-11618-DJC, 2020 WL 1821863 (D. Mass. Apr. 10, 2020). Given the highly deferential leash to which we are strapped by the standards governing this appeal, we affirm the district court's denial of Field's petition.

### A. Background

"We take the facts largely as recounted by the [SJC] decision affirming [Field's] conviction, 'supplemented with other record facts consistent with the SJC's findings.'" Yeboah-Sefah

- 2 -

v. <u>Ficco</u>, 556 F.3d 53, 62 (1st Cir. 2009) (citing <u>Healy</u> v. <u>Spencer</u>, 453 F.3d 21, 22 (1st Cir. 2006)).

**The Initial Encounter**

Though not the traditional way to tell a story, we'll start this tragic recounting in the middle of things, when Field was first encountered by police. On the afternoon of August 9, 2010, police officers at the Brockton Police Department spotted a car parked outside the lobby doors of the precinct, blocking the exit area of the station. A woman who was later identified as Field was in the driver's seat, smoking a cigarette and drinking a coffee. Three officers approached her car and spoke with Field, who complained of chest pain. She also stated that she was bipolar. One of the officers asked her if she was well enough to get out of the car so they could move it out of the way of the exit, and when she agreed, the officer noticed blood on her hands and forearms. The officer asked how she got the blood all over her, and she replied, "I just killed someone."

**How It Started**

Let's back up now and fill in the backstory leading up to the murder, cobbling together the story of what transpired with the benefit of hindsight (i.e., using information provided in the police interviews and trial testimony, as recounted in the state court decision denying Field's motion for a new trial, and the SJC's review of the same). Eunice Field was a fifty-four-year-

old woman at the time she committed this crime. In the years leading up to its commission, Field had a history of suffering from mental health and substance abuse disorders, the most prominent of her issues being her battle with bipolar disorder. Her ex-girlfriend, Renee Williams ("Williams"), testified at trial that Field had been hospitalized at least ten times in twenty years. At one point, she was in a Veterans Administration program on Cape Cod for over two years. Not all of these hospitalizations were specifically mental health related -- some of her hospitalizations were for substance abuse or abuse of medications. Earlier in the year, Williams and Field ended their twenty-year relationship and opted to just be friends, though it appears they continued to share an apartment in Brockton, Massachusetts. According to Williams, Field felt Wachsman had influenced Williams into ending the relationship. Following the breakup, Field spent a few months living in Tennessee but later returned to Brockton; upon her return, Field and Williams maintained a platonic friendship. The weekend before the murder, Williams and Field attended a few cookouts and meetings, and Williams testified Field generally seemed normal, if a bit quiet. They were also together the day before the incident (Sunday), which Williams similarly testified was a normal day (for example, they watched movies, Field spent time on her computer) -- Field even told Williams she had called Wachsman and said she was going to meet with her at 11:00

- 4 -

a.m. the next day -- a Monday.  As it turns out (Field later explained at the post-killing police interview), another reason Field wanted to visit Wachsman was because she wanted to "clear the air" about Ruthie (a friend of Field's who was terminally ill, and Field said that Wachsman would not allow her to go see Ruthie before she died a few years previous, but we are unclear about the relationship between Wachsman and Ruthie based on the record).

That night, Field posted a message to her Facebook page that read, "Tic toc, tic toc.  I'm going to finish my book tomorrow. You're all going to be real interested in it because you're all in it.  The title is Tormented Minds by Eunice Field."  She also wrote a letter to Williams (found the evening of the murder in Field's apartment pursuant to a search warrant), which read in part that Wachsman "will get what she deserves for coming between you and me."  The morning of the crime, Williams testified that there was nothing odd about Field's behavior.

We know that after making breakfast for Williams, Field went to Wachsman's home in Bridgewater.  She stabbed Wachsman nine times -- six times in her neck, two in her chest, and one in her back.  She then found herself at the Brockton Police Department.

### The Police Interviews

Back to the Brockton Police Department.  After approaching Field in her car, the officers proceeded to ask Field if she would come into the lobby of the station.  One of the

- 5 -

officers asked Field who she killed, and she replied, "Lorraine Wachsman." The officer then asked why she killed Wachsman, and she replied, "[b]ecause she got in my way." She later clarified this statement to mean that the victim got in the way of her and her ex-girlfriend (later identified as Williams). When asked what she used to kill the victim, Field said that she used a kitchen knife. Field could not identify the address of Wachsman, but instead gave a general location. Some time later, EMTs arrived to provide medical assistance to Field because of her complaint about having chest pain. Field reiterated to the EMTs that she stabbed someone. During this time, Field did not appear to be confused by the questions and did not have difficulty answering any questions, though she was slow in answering the questions, sometimes taking five or ten seconds before answering. Bridgewater police eventually discovered Wachsman's body in her home that afternoon.

After the initial inquiries, the Brockton police subsequently conducted a video-recorded interview with Field. The interview lasted approximately one hour and forty minutes. One of the detectives conducting the interview, Detective Clark, read Field her Miranda warnings and a warning of the right to stop questioning. When asked if she understood these warnings, Field replied, "Yeah." She was then asked if she wished to waive her Miranda rights and she replied, "Yeah."

The other detective, Detective Congdon, asked Field if she needed medical attention, which she declined. During the video interview, Detective Congdon asked Field about any medical ailments she had, to which she responded she was bipolar. The detectives then proceeded to interview her about the incident, and she stated that she stabbed Wachsman in the chest with a kitchen knife, and said that Wachsman "always got in the way." She admitted that she went to Wachsman's home with the purpose of killing her, and that she took the knife from her own home. As we mentioned earlier, she called Wachsman the night before to arrange the visit. When she got to her house, she "took the knife out right away" and "rushed" it into Wachsman's chest. She indicated that there was a struggle.

During the interview, Field exhibited a slowness in answering the questions, and took unusually long pauses between words and sentences. She also at times appeared not to be listening to the questioning and talking about other things, which were often "irrelevant and nonsensical."

Later in the day, Field was transferred to the Bridgewater Police Department. There, officers conducted yet another video-recorded interview with Field. Once again, she was given her Miranda warnings and also advised of her right to stop the questioning. Field signed the Miranda form, and requested food and a cigarette. She agreed to questioning while she waited

for her food order. During this interrogation, Field made additional incriminating statements, including Field indicating that she did not attempt to help Wachsman and that she felt good about her actions that day. But she stated that she would not answer any additional questions without food. However, one of the officers conducting the interview, Lieutenant Coppenrath, continued to ask her questions, some of which she answered, some of which she did not. The interview lasted around forty-six minutes.

## B. Procedural History

A state court grand jury indicted Field for murder in the first degree on October 21, 2010. Approximately two years later, on October 2, 2012, her trial began in Plymouth Superior Court. During the trial, the Commonwealth introduced the two video-recorded police interviews and called a forensic psychiatrist, Dr. Russell Vasile ("Dr. Vasile"), as an expert witness. Dr. Vasile testified that after watching Field's interviews, he did not see evidence of manic behavior, depression, delusions, psychosis, or hallucinations. He also testified to a "reasonable degree of medical certainty" that Field was criminally responsible for her actions. Dr. Vasile was cross-examined by Field's trial counsel. The focus of trial counsel's cross was to point out that the basis of Dr. Vasile's testimony was not "generally accepted in the psychiatric field" and also to "impeach

him with his statements that made it sound as if it was appropriate to look at a DVD of a police interrogation and make a diagnosis."

In Field's defense, trial counsel did not introduce a mental health expert, nor did he contest that Field killed Wachsman. Rather, his strategy was to convince the jury that Field's bipolar disorder prevented her from forming the requisite intent to commit first-degree murder. He later testified at the post-trial motion hearing that he believed that the "bizarre behavior" in the two interviews would make the jurors sympathetic to Field, and they would only convict her of second-degree murder. That strategy proved unsuccessful, and Field was convicted of first-degree murder based on deliberate premeditation and extreme atrocity or cruelty on October 11, 2012. She was sentenced to a term of life imprisonment without the possibility of parole.

Field filed a notice of appeal on October 17, 2012, to the Supreme Judicial Court ("SJC"). Equipped with a new attorney, and while her appeal was pending, on June 19, 2014, she filed a motion for a new trial, asserting that her trial counsel provided ineffective assistance of counsel by failing to consult a mental health expert on trial strategy. Later that month, the SJC stayed the appellate proceedings and remanded Field's motion for a new trial to the Plymouth Superior Court. Field then filed a supplemental motion for a new trial, asserting that trial counsel was also ineffective for failing to move to suppress the two video-

- 9 -

recorded police interviews. The trial court held an evidentiary hearing on January 8, 2016, on the motions for a new trial. Field enlisted a post-trial expert witness, Dr. William Land ("Dr. Land"), a clinical and forensic psychiatrist, who testified that Field, on the day she was questioned, was incapable of voluntarily waiving her Miranda rights or voluntarily making a statement. He also testified that she was incapable of acting with extreme atrocity or cruelty at the time of the crime because of her mental illness. Dr. Land did not testify, however, that she lacked the capacity for deliberate premeditation -- a theory on which she was convicted of first-degree murder. Our review of the record indicates that her counsel did not ask Dr. Land for testimony as to whether Field had the mental capacity to form the mindset necessary for deliberate premeditation.

After the evidentiary hearing, Field filed a second supplemental motion for a new trial on the same grounds of ineffective assistance of counsel, this time arguing that trial counsel provided ineffective assistance by failing to consult a mental health expert to determine Field's competency to stand trial. Ultimately, the trial judge denied all three motions for a new trial, and Field filed a new notice of appeal to the SJC. Unconvinced, the SJC affirmed the trial court's rulings. See Field, 79 N.E.3d at 1039.

In its opinion, the SJC assessed Field's ineffective assistance claims under the Massachusetts equivalent of Strickland v. Washington, 466 U.S. 668 (1984), Commonwealth v. Saferian, 315 N.E.2d 878, 882 (Mass. 1974) (we get into the Strickland standard later on, so we won't repeat it here). The SJC found that trial counsel erred by failing to consult a mental health expert on trial strategy, but the error did not warrant relief because the SJC found Field did not demonstrate prejudice, or a "basis on which to conclude that consultation with [an] expert would have altered the jury's conviction of murder in the first degree based on deliberate premeditation." Field, 79 N.E.3d at 1043.

Its holding regarding the failure to suppress was similar (though it did not hold that not suppressing the video tapes was in error). Instead, the SJC concluded that showing them to the jury was a "tactical decision that was not without justification." Id. Trial counsel's belief was "that allowing the jury to view the video recordings of both police interviews and to observe her strange behavior firsthand would increase the likelihood that the jury would find that [Field] had not premeditated the killing or acted with extreme atrocity or cruelty." Id. On the record before it, said the SJC, it could not conclude that if the videos had been excluded, it would have affected the jury's verdict. Finally, the SJC found that although

- 11 -

consulting with a mental health expert may have helped her counsel discern whether Field was incompetent to stand trial, she "presented no evidence, beyond trial counsel's statement that he was not sure that the defendant understood the mental impairment defense, that the defendant was incompetent to stand trial." Id. at 1044.

Gaining no traction in state court, Field filed a habeas petition in the United States District Court for the District of Massachusetts. In her petition, she claimed ineffective assistance on substantially the same grounds as she did in state court. First, she claimed trial counsel failed to consult a mental health expert in raising a mental health defense and in cross-examining Dr. Vasile (i.e., trial strategy); second, trial counsel failed to move to suppress the video-recorded interviews; and third, he failed to consult a mental health expert to determine Field's competency to stand trial. The district court denied Field's petition, and we now assess her claims with fresh eyes.

## C. Standard of Review

Because Field's murder case was adjudicated in state court, AEDPA marshals our review of the claims brought before the state court. 28 U.S.C. § 2254. Pursuant to AEDPA,

> the application for habeas corpus must be denied unless
> the state court's adjudication of the claim satisfies
> either of two conditions: (1) it "resulted in a decision
> that was contrary to, or involved an unreasonable
> application of, clearly established Federal law as

- 12 -

determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Yeboah-Sefah, 556 F.3d at 65 (citing 28 U.S.C. § 2254(d) (emphasis our own)).

With respect to the first condition under 28 U.S.C. § 2254(d)(1), "a state court's decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite from that reached by the U.S. Supreme Court on a question of law, or if the state court decides the case differently than the U.S. Supreme Court has on a set of materially indistinguishable facts." Sleeper v. Spencer, 510 F.3d 32, 37-38 (1st Cir. 2007). Whereas, most relevant here,[1] "[a]n unreasonable application occurs when 'the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case.'" Bebo v. Medeiros, 906 F.3d 129, 134 (1st Cir. 2018) (quoting White v. Woodall, 527 U.S. 415, 425 (2014)). "To be unreasonable, the state court's application of existing legal principles must be more than merely erroneous or incorrect." Sleeper, 510 F.3d at 38. An unreasonable application "must be great enough to make the decision unreasonable in the independent

---

[1] The Supreme Court has found an ineffective assistance of counsel claim to be a mixed question of law and fact and is thus to be evaluated under the unreasonable application clause of 28 U.S.C. § 2254. Yeboah-Sefah, 556 F.3d at at 70 (citing Williams, 529 U.S. at 409).

- 13 -

and objective judgment of the federal court." Id. (quoting McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002)). "Even where a state court has misapplied federal law, we will only grant relief to the petitioner 'in cases in which all fairminded jurists would agree that a final state court decision is at odds with the Supreme Court's existing precedents.'" Strickland v. Goguen, 3 F.4th 45, 53 (1st Cir. 2021) (quoting Dorsica v. Marchilli, 941 F.3d 12, 17 (1st Cir. 2019)). If the petitioner does succeed in demonstrating error, "it is still not enough to win because [s]he must also illustrate 'actual prejudice' resulted from the mistake." Id. at 54.

As it relates to the second factor (28 U.S.C. § 2254(d)(2)), "AEDPA sets out a separate and exacting standard applicable to review of a state court's factual findings." Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007). "A determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Our judicial superiors instruct us that "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103, 131 (2011). "When a

- 14 -

habeas claim has been adjudicated on its merits in state court, [AEDPA] mandates highly deferential federal court review of state court holdings." Zuluaga v. Spencer, 585 F.3d 27, 29 (1st Cir. 2009).

Having laid out this deferential foundation, we'll note that we review the federal district court decision de novo, see Scott v. Gelb, 810 F.3d 94, 98-99 (1st Cir. 2016)[2], bearing in mind we have limited leeway under AEDPA, and even less when it comes to ineffective assistance claims.

## D.  Discussion

Field brings claims for ineffective assistance of counsel related to three errors she contends were made by her trial counsel, and she also makes a cumulative error argument. Of course, her ineffective assistance claims must be viewed in light of the habeas framework we just described, and she sums up her argument like this:  "The [SJC's] decision was contrary to and involved and unreasonable application of clearly established federal law where . . . its finding that [Field] was not denied the effective assistance of counsel was based on an unreasonable determination of the facts in light of the evidence."  And more

---

[2] There is a simple reason for that: "[W]e are effectively in the same position as the district court" to look at "the state court record" when, as here, the district court did not conduct any factfinding. Rivera v. Thompson, 879 F.3d 7, 13 (1st Cir. 2018) (quoting Pike, 492 F.3d at 68).

specifically, "the finding that [Field] was not prejudiced by counsel's failures was an unreasonable application of Strickland's prejudice prong."[3] We will address each of her arguments in turn as we move forward.

Before we dive into the merits, first a primer on ineffective assistance claims which will help guide our analysis. "The Sixth and Fourteenth Amendments to the United States Constitution afford a defendant the right to effective assistance of counsel in all state criminal prosecutions which may result in the loss of [her] liberty." Yeboah-Sefah, 556 F.3d at 70. In order to demonstrate that she received ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution, Field must show two things: that her defense counsel's performance was (1) constitutionally deficient and (2) that this deficiency prejudiced her case. Strickland, 466 U.S. at 687. At prong one, Field must demonstrate that "counsel's

---

[3] Field has framed her arguments under AEDPA in a way that is not consistent with how we understand the law to operate, and therefore it has required some interpretation on our part. We understand Field's argument to be that, under AEDPA, her claim satisfies both conditions that entitle her to habeas relief, meaning she is arguing that the SJC both misapplied federal law in its interpretation of Strickland's prejudice prong, and separately and in part, that it made an unreasonable determination of the facts in light of the evidence before it. Field appears to mix both these considerations together in her brief with little explanation of how she meets the exacting standards under AEDPA for each consideration, but we've tried to separate them out as best we can.

performance was objectively unreasonable 'under prevailing professional norms.'" United States v. Mercedes-De La Cruz, 787 F.3d 61, 67 (1st Cir. 2015) (quoting Strickland, 466 U.S. at 688). This standard is "highly deferential" and thus we must "indulge a strong presumption that . . . under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Further, "[w]hen examining counsel's conduct, the court considers the facts of the particular case from counsel's perspective at the time." Sleeper, 510 F.3d at 38.

At Strickland's prong two, Field must affirmatively prove that the deficient performance was prejudicial. 466 U.S. at 687. To demonstrate prejudice, Field must show "that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." Yeboah-Sefah, 556 F.3d at 70 (quoting Sleeper, 510 F.3d at 38). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

To bring it all together, the Supreme Court has instructed us that "[w]hen [AEDPA] applies [in concert with Strickland], the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 562 U.S. at 105.

**Ineffective Assistance in Failing to Procure a Mental Health Expert**

Field first argues that trial counsel provided ineffective assistance of counsel for failing to consult a mental health expert in raising a mental health defense and in cross-examining the Commonwealth's expert, Dr. Vasile, at trial. Her ineffective assistance argument goes like this: "It is not within the most tolerant standard of competence to forego having the defendant undertake a mental health defense examination." Had trial counsel consulted a mental health expert, it would have become obvious that Field's statements were not voluntary, and using a forensic psychologist as opposed to Field's statements "would not have opened the door to the contents of her statements by police." This matters, says Field, because her statements were not voluntary given that she was not rational at the time she gave them.

As evidence of trial counsel's incompetence in cross-examining Dr. Vasile, she points to the fact that Dr. Land (the post-trial motion expert for Field) "countered the testimony of the Commonwealth's armchair expert [Dr. Vasile]." Had trial counsel hired an expert himself to counter the testimony of Dr. Vasile at trial, the "risk of mistakes" made by Dr. Vasile would have been "minimized." Tying this back to AEDPA, we read her

argument to be that the SJC unreasonably applied federal law when it misapplied the prejudice prong of Strickland. She argues that "even if evidence independent of [her] confession was not insubstantial, or that it could have supported a guilty verdict in the absence of [her] confession, that is not the standard in Strickland." In Field's view, the SJC (and the trial court in the post-conviction proceedings) ignored crucial facts, including: that Dr. Land "found evidence of psychosis at the time of the crime"; that the evidence of premeditation that came in through the videos was involuntary and highly prejudicial; and that had a motion to suppress the statements been filed, it would have likely been meritorious.

Whether the SJC applied Strickland unreasonably is not the same as asking whether defense counsel's performance fell below Strickland's standard. Our obligation is the former -- to determine whether the SJC unreasonably applied the clearly established federal standard for examining Field's ineffective assistance of counsel claim as outlined in Strickland. In considering Field's argument, the SJC did not take issue with her argument as to the inadequate performance of Field's counsel. Instead it concluded that although trial counsel erred in failing to consult a mental health expert, Field ultimately had not "established that [trial counsel's] failure was likely to have influenced the jury's verdict of murder with deliberate

premeditation." Field, 79 N.E.3d at 1041. Meaning, the SJC found that Field was not prejudiced by trial counsel's error in not consulting an expert. Given the AEDPA limits of our review, we cannot conclude that the SJC applied the Strickland standard to the facts in an objectively unreasonable manner. Brown v. Payton, 544 U.S. 133, 141 (2005).

While it is certainly concerning, given the lengthy history of Field's mental health struggles, that an attorney would not, at a minimum, consult a mental health expert to assist in trial strategy, we cannot say that the SJC's determination under Strickland was unreasonable. Field fails to present specific arguments as to why consulting a mental health expert would have influenced the jury in deciding deliberate premeditation. Crucially, Dr. Land (the post-conviction mental health expert) never testified that Field lacked the capacity to deliberately premeditate. The record is replete with evidence -- from Field arranging the meeting with Wachsman, to drafting her Facebook post, the letter to Williams essentially confessing or at least previewing her planned revenge on Wachsman for "getting in the way," and her issues with Wachsman over her friend Ruthie -- all of which reasonably support the conclusion that she deliberately premeditated the crime. Concluding that the SJC's application of Strickland's prejudice prong was not unreasonable, we also note

that "we must give double deference[4] to the [SJC's] choices about ineffective assistance of counsel claims, especially when fairminded jurists could not disagree on the correctness of the [SJC's] application of federal law." Goguen, 3 F.4th at 61 (cleaned up); see also Walker v. Medeiros, 911 F.3d 629, 636 (1st Cir. 2018) ("Thus, under AEDPA, so long as the SJC's ruling that there was no 'miscarriage of justice' due to the other evidence of [the defendant's] guilt that the jury had before it is not 'so lacking in justification' as to be 'beyond any possibility for fairminded disagreement' we must defer to it." (citing Harrington, 562 U.S. 86 at 131)).

**Ineffective Assistance in Failing to Move to Suppress Video-Recorded Police Interviews**

Next, Field claims that trial counsel provided ineffective assistance for failing to move to suppress the two video-recorded interviews. Field focuses the weight of her ineffective assistance argument on rehashing the mistakes trial counsel made in the first instance, rather than focusing on whether the SJC unreasonably applied Strickland (which, as we previewed above, is what we must focus on here). For instance, she argues that the waiver of her Miranda rights was not made "knowingly,

---

[4] Layered on top of the significant respect we afford to a defense counsel's advocacy choices under Strickland is the significant respect we give a state court's reasonable application of federal law.

intelligently, and voluntarily" due to the fact that she suffers from mental illness, as Dr. Land testified. Her statements made to the police were not voluntary for the same reason. Adding to that, she points out that trial counsel was ineffective in not moving to suppress the interviews (and the statements contained therein) for another reason: Field had invoked her right to silence by saying she did not want to be asked more questions in the Bridgewater police interview, but they continued to ask her questions. Her statements moving forward from there should have been inadmissible, she says.

Tying all of this to AEDPA, she argues that the SJC's determination that failing to suppress the statements did not lead to prejudice was an unreasonable application of the Strickland prejudice prong.[5] As she sees it, "[w]ithout these recordings . . . the jury would not have had a sufficient basis to find either premeditation or extreme atrocity or cruelty." Field, 79 N.E.3d at 1043. Trial counsel testified at the post-trial motion hearing

---

[5] Field also claims in her brief that she intends to put forth an argument that the state court's decisions regarding her arguments relating to the failure to file a motion to suppress the statements was an unreasonable determination of the facts, and points to findings made at the trial court and at the SJC. For one, we are only reviewing the decision of the SJC, so her claims regarding findings of the trial court are not relevant to this petition. Second, we must accept the SJC's factual findings as true, and nowhere does she say explicitly what the SJC got wrong, never mind meeting the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

that he "believed that allowing the jury to view the video recordings of both police interviews and to observe her strange behavior firsthand would increase the likelihood that the jury would find that the defendant had not premeditated the killing or acted with extreme atrocity or cruelty." Id. Because of this, the SJC concluded that trial counsel's choice not to move to suppress was a "tactical decision not without justification." Id. The SJC decided that it did not "need to resolve whether counsel's judgment was manifestly unreasonable because even if we were to assume that it was . . . [it could not] conclude on this record that the admission of the video-recorded interviews was likely to have affected the jury's verdict of murder by deliberate premeditation." Id. The SJC noted (as we have, above) the record contains plenty of "evidence of deliberate premeditation from other sources (such as her confessional note, her social media post, and her arranging the meeting with the victim) . . . [evidence] so overwhelming that we cannot say admission of the video recording was likely to have influenced the jury's decision to convict her on the theory of premeditation." Id. at 1044. While the SJC did not explicitly determine whether trial counsel erred in not moving to suppress the video-recorded interviews, under Strickland,[6] this court is cautioned that "strategic choices

_____

[6] As Strickland has noted:

- 23 -

made [by trial counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690. The SJC determined, as we've noted, that trial counsel made a "tactical decision," and we cannot say that the SJC unreasonably applied the Strickland ineffective assistance of counsel standard as it relates to prejudice, particularly where there was overwhelming evidence of premeditation that was in evidence absent the video-recorded interviews. Because of that, as the SJC found, there was not a reasonable probability of a different outcome at trial. What's more, remember that "we must use a doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt." Pena v. Dickhaut, 736 F.3d 600, 606 (1st Cir. 2013) (citations and internal quotation marks omitted). We therefore agree with the district court's determination that Field is not entitled to habeas relief on this claim.

---

[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 697.

**Ineffective Assistance in Not Challenging Competence to Stand Trial**

Field argues that by failing to consult a mental health expert in order to ascertain her competency to stand trial, trial counsel's assistance was ineffective. In support of this argument, she points to evidence from the new trial proceedings, such as trial counsel's statement that he did not think she understood "what was going on" or that "she caught on what was going on." This, combined with her bipolar disorder and the symptoms attendant to her mental health condition, made it unreasonable for trial counsel not to consult with a mental health expert.

Under AEDPA, the SJC's findings, according to Field, "were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." The "factual finding" that Field points to is the SJC's determination "that counsel merely 'was not sure that the defendant understood the mental health impairment defense,'" which constituted "an unreasonable determination of the facts." Field also points out that the SJC (and the trial court) both ignored the testimony of trial counsel himself, who noted that Field could not effectively communicate with him, which was "all the evidence the court needed" to determine that she received ineffective assistance.

The SJC disagreed. It concluded that there was no evidence presented (beyond trial counsel's statement that he was

not sure she understood the mental impairment defense), that Field was incompetent to stand trial. Field, 79 N.E.3d at 1044. Although Field argued that a mental health expert may have helped trial counsel realize that she was incompetent to stand trial, there was no evidence presented to support that conclusion. Id. Field herself, when presented with the post-trial opportunity to have an expert witness opine on whether she was competent to stand trial, did not ask her expert, Dr. Land, to opine on that subject. Id. at 1044-45.

As we've said before, we accept the SJC's factual determinations to be true, and in order to succeed on her AEDPA claim, it is Field's burden to "rebut[] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Field does not meet her burden. Instead, what Field asks us to do here is to consider other statements made by trial counsel at the post-trial motion hearing, such as that Field was not substantively communicating with him and that she didn't understand what was going on. But, since this claim is entitled to double deference under AEDPA (as it was decided on the merits in state court), and there was "no indication that trial counsel failed to exercise 'reasonable professional judgment' [in not consulting a mental health expert on competency] . . . we cannot say that the SJC applied Strickland in an objectively unreasonable manner in finding a lack of deficiency in counsel's performance."

Yeboah-Sefah, 556 F.3d at 82-83 (quoting Strickland, 466 U.S. at 690).

**Cumulative Error**

Finally, Field contends that the totality of trial counsel's errors resulted in prejudice. "Absent any particularized error, there can be no cumulative error." Williams v. Drake, 146 F.3d 44, 49 (1st Cir. 1998). Because we find no prejudice on any of the three purported errors above, Field is not entitled to relief on her cumulative error claim.

**E.   Conclusion**

For the reasons detailed above, we **affirm** the district court's denial of Field's habeas petition.