# United States Court of Appeals
## For the First Circuit

No. 20-1496

JORGE QUINTANILLA,

Petitioner, Appellant,

v.

RAYMOND MARCHILLI, Superintendent, NCCI - Gardner,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Howard, Circuit Judges.

Eduardo Masferrer, with whom Masferrer & Associates, P.C. was on brief, for appellant.
Susanne G. Reardon, Assistant Attorney General, with whom Maura Healey, Attorney General, was on brief, for appellee.

November 2, 2023

**HOWARD**, **Circuit Judge**.  In January 2010, Petitioner-appellant Jorge Quintanilla ("Petitioner") was convicted in Massachusetts state court of three counts each of rape, rape of a child, and assault and battery with a dangerous weapon, and one count of assault and battery.  The charges arose from his abuse of a single female victim between 2004 and 2008.  Following his conviction, Petitioner sought a new trial in the state courts, arguing, inter alia, that his trial counsel had been ineffective in (1) failing to introduce pharmacy records purportedly showing that the victim was over the age of consent throughout the relevant period, (2) introducing or failing to object to the introduction of inadmissible evidence that purportedly harmed his defense, and (3) failing to investigate potential defense witnesses.

The Massachusetts Appeals Court ("MAC") affirmed the state trial court's denial of a new trial in a summary decision under MAC Rule 1:28, concluding that Petitioner's trial counsel had not performed deficiently with respect to his first two claimed bases for relief and that the failure to interview potential defense witnesses had not prejudiced Petitioner.  See Commonwealth v. Quintanilla, No. 16-P-1556, 2018 WL 1040522, at *3-4 (Mass. App. Ct. 2018) ("Memorandum and Order Pursuant to Rule 1:28").

Petitioner then sought habeas relief in the U.S. District Court for the District of Massachusetts, again raising his ineffective assistance claims.  The district court denied

relief but issued a certificate of appealability allowing Petitioner to seek review in this court. <u>Quintanilla</u> v. <u>Superintendent</u>, No. 19-cv-11052, 2020 WL 1139882, at *7 (D. Mass. Mar. 9, 2020). Applying the deference required by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of the U.S. Code), we affirm.

**I.**

**A.**

"We take the facts largely as recounted by the [last reasoned state court] decision . . . supplemented with other record facts consistent with [those] findings." <u>Field</u> v. <u>Hallett</u>, 37 F.4th 8, 12 (1st Cir. 2022) (internal quotation marks omitted) (quoting <u>Yeboah-Sefah</u> v. <u>Ficco</u>, 556 F.3d 53, 62 (1st Cir. 2009)).

The victim of Petitioner's abuse was, as she testified at Petitioner's trial, born in El Salvador on March 25, 1990, and in 2003 immigrated to the United States to live with family. She did not have legal immigration status at the time. Shortly after arriving in the country, she met Petitioner, who first forced her to have sex with him against her will at her half-sister's house

in February 2004 when the victim was thirteen and Petitioner was twenty-five.[1]

Thereafter, also in February 2004, the victim's and Petitioner's families decided that the victim would move into Petitioner's family home.  The victim testified at trial that she did not want to move in with Petitioner and that Petitioner told her he had bought her from her father for $100.  She resided with Petitioner from February 2004 to June 2008.[2]

The victim testified she was treated as a prisoner or "slave" during that time.  Petitioner forced her to take part in nonconsensual anal, oral, and vaginal intercourse multiple times per week.  He also abused her physically (for example, by beating her when she refused sex or was out of the house without permission, shooting her with a BB gun, and cutting her hair with a knife) and emotionally (for instance, by threatening to report her to immigration authorities or to purchase a real firearm and shoot her with it).  The victim was required to perform chores for Petitioner and his family.

---

[1]  Petitioner was not charged with a crime in connection with this encounter.

[2]  The victim and Petitioner lived in Petitioner's family home for most of this period, but also lived for a few months in a rented room outside the home.

On or around June 17, 2008, the victim contacted a friend of Petitioner's family, Elida Flores, and asked her for help, arranging to meet at a laundromat. When Flores arrived, the victim was "terrified" and had bruises on her face and legs. The victim's hair had also been cut short. Flores took the victim to the home of another friend of the victim and Flores, Beatrice Morales. The victim told the women that Petitioner had physically abused her. Flores and Morales took photographs of the victim's injuries, then took her to a women's shelter.

On the advice of shelter workers, the victim sought and obtained a restraining order against Petitioner. As part of that process, she met with Sergeant Michael Mulcahy of the Somerville Police Department on June 17, 2008. The victim told Sergeant Mulcahy that Petitioner had abused her physically. Sergeant Mulcahy took additional photographs of the victim's injuries.

Some time later, the victim called Flores from the women's shelter where she was staying and stated that Petitioner had sexually abused her for years, including by charging money for other men, among them his brother, Moris Quintanilla, to have sex with her.[3] The victim also told Flores during the call that

---

[3] Flores did not recall precisely when the call took place; she estimated that "it was less than a month after [the victim] had left [Petitioner's home]."

Petitioner's mother had regularly given her shots that made her "feel dizzy."

On October 31, 2008, the victim participated in a videorecorded Sexual Assault Investigative Network ("SAIN") interview with Sergeant Mulcahy, an unidentified forensic interviewer, and an interpreter. The victim recounted during that video recorded session years of emotional, physical, and sexual abuse by Petitioner. She also alleged that Petitioner's mother had practiced witchcraft against her. This interview was the first time Sergeant Mulcahy learned of the allegations of sexual abuse. This video recorded interview before "seven or eight people" was shown to the jury.

## B.

In December 2008, a Massachusetts grand jury sitting in Middlesex County returned a twelve-count indictment charging Petitioner with four counts of rape of a child, see Mass. Gen. Laws ch. 265, § 23; four counts of rape, see id. § 22(b); three counts of assault and battery with a dangerous weapon, see id. § 15A(b); and one count of assault and battery, see id. § 13A(a).[4]

---

[4] Petitioner had previously been arraigned on June 20, 2008, in Somerville District Court on a criminal complaint charging him with assault and battery with a dangerous weapon, see Mass. Gen. Laws ch. 265, § 15A(b); intimidation of a witness, see id. ch. 268, § 13B; and threat to commit a crime, see id. ch. 275, § 2, based on the victim's allegations during her first interview with Sergeant Mulcahy. The Commonwealth filed a nolle prosequi on

Petitioner pleaded not guilty on all counts, and the case proceeded to trial in Middlesex Superior Court in January 2010.

The prosecution's case was built on several days of testimony by the victim, supported by the testimony of Flores, Morales, and Sergeant Mulcahy.

During direct examination the victim testified she first met Petitioner when she was thirteen years old and he was twenty-five at a "club" called Armenia she went to with some family members where the two danced and talked together. She testified she saw him for a second time at a different club some unspecified amount of time later where he told her that he had "asked a friend to loan him his car keys" in advance so that "when the band had a recess, [Petitioner could take the victim] to the car and [they]'d have sex." She testified that she and Petitioner did not have sex that night. The victim's and Petitioner's families came to know each other during this time.

As the victim testified on direct, after this second meeting at a club, Petitioner began calling the victim and, after the victim gave him her address, visited her where she then lived with her sister. The victim described, in detail, how she was home alone on Petitioner's visit in or around February of 2004.

those charges in January 2009, after the grand jury indictment issued.

She described how, when he arrived, Petitioner entered the home without being invited in, brought her to the guest room in the house, laid her on the bed, crawled on top of her, undressed her, and forced her to engage in oral and vaginal intercourse without her consent and while she repeatedly tried to get him to stop. When her sister returned to the house and discovered the victim there with a man (Petitioner was no longer raping the victim at this point), she became angry and "said she would send [the victim] back to [her] country," a reference to El Salvador.

As the victim testified on direct, she ran away that day. When another one of the victim's sisters eventually located her and contacted Petitioner to pick her up, he arrived and picked her up in a friend's car on the same day. During that car ride Petitioner told the victim, "Don't tell anybody we ha[d] sex," because he was "gonna deny everything." Petitioner eventually brought the victim to her ex-stepmother's boutique business where her ex-stepmother and Petitioner's mother both were at the time.

The victim testified that other members of her family, including her father, arrived at that business and talked with Petitioner's mother, after which her father and one of her sisters told her to "[l]eave with [Petitioner]." Petitioner then asked the victim if she "wan[ted] to come with [him]." When she said "no," "[h]e told [her] 'No matter; you're coming,'" and took her from the boutique. The victim testified that she left with

Petitioner because she "fe[lt] she d[id]n't have any choice." From there, she testified that Petitioner took her to live with him and his family where she slept in the same bed as Petitioner. She testified that Petitioner later told her that he had paid "a hundred dollars for [her]" that day.

Throughout the rest of her direct testimony, the victim described in graphic detail her treatment while living with Petitioner over the next roughly four years. She testified that Petitioner refused to let her attend school and from when she arrived in February 2004 at age thirteen until she escaped to a women's shelter in June 2008 he forced her to "clean the room," "take care of his hair," "shave him," "give him a massage when he g[ot home] from work," "make him some food," "take care of his shoes and . . . his clothes" including "wash[ing] his clothes," "cut his nails," and "shave his private parts." The victim testified that she took all her meals in the room.

The victim testified that she "only had permission to [leave the house to] go to the grocery store or to do laundry," and Petitioner required that she call him before leaving for one of those destinations and call him again when she returned. She testified that Petitioner regularly beat her, including by kicking her with steel-toed boots; threatened her with a knife; and on at least one occasion "cut [her] hair with that knife" as punishment.

She testified that he would also threaten to "call . . . immigration" if she did not obey him.

The victim testified that Petitioner would "stick [his penis] into [her] mouth by force" "three or four times a week" from when she arrived at the house in 2004 until she left in 2008. She testified to graphic details of the way Petitioner would force her to perform this oral sex, including the specific way he would position his body to keep her from moving and his habit of telling her to "[p]ut the volume of the t.v. up so nobody can hear it." She testified that if she refused Petitioner would "punch [her] in [her] face or slap [her]." She testified in similar detail to repeated acts of forced, non-consensual anal and vaginal intercourse on a weekly basis during this time. She testified that soon after she moved in with Petitioner, Petitioner's mother began "injecting [the victim] with . . . birth control shots so [she] wouldn't have any children."

The victim testified that at some point in June 2008 she began discussing Petitioner's abuse with Elida Flores, a family friend. As part of these conversations, the victim also "prepare[d] a suitcase and . . . put a little bit of [her] clothes there and shoes" and took the suitcase to Flores's house "[e]arly in the morning when everybody was asleep and [Petitioner] and his mother were working." Later that month, on or around June 17, 2008, and after being beaten over the course of several days by

Petitioner, the victim decided to "go to the laundry" to "call Elida [Flores] and ask for her help . . . to get out of there." Soon after, Flores arrived in a car. The victim got into "[t]he back and . . . laid down so nobody could see [her]."

The victim testified that Flores took her to the home of Beatrice Morales, Flores's friend. At Morales's house, the victim told the pair "everything" that Petitioner had done to her and showed Flores and Morales the bruises on her body. Flores and Morales took five photographs of the victim's body that day, June 17, 2008, which graphically depicted the injuries to the victim's head, face, and right leg as of that date and substantiated the victim's testimony that her hair had been cut. The victim identified these photos during her direct testimony, and they were admitted into evidence. Flores and Morales took the victim to a local organization serving women escaping abuse which helped her obtain a protection order against Petitioner and placed her in a women's shelter.

The victim's testimony on cross-examination established that she had never attempted to contact the police prior to June 2008, despite having had access to a phone in Petitioner's home and opportunities to seek assistance during time spent outside the home; that her accusations against and assistance with the prosecution of Petitioner had enabled her to obtain a visa to remain in the United States legally; that she had at one point

- 11 -

loved Petitioner; that she had suspected him of cheating on her; and that she had made several phone calls to him after obtaining the restraining order against him in June 2008.

On cross-examination the victim also testified that "almost every month" she would "wake up . . . naked" in a room where she would see Petitioner "collecting money" from several men. On at least one such occasion she recalled that one of these men was Petitioner's brother, Moris Quintanilla, who she stated "touch[ed]" her "sexually" at that time.

Flores's testimony corroborated the victim's testimony. Flores testified that the victim appeared bruised and beaten with "short hair" in June 2008 and the victim stated she was afraid to return to Petitioner because he had mentioned getting access to a pistol. She testified that the victim later shared with her additional details -- "so many things [that Flores] wouldn't have enough time to tell [the court while testifying]" -- about how Petitioner "would beat her, . . . would abuse her sexually and in different ways" and that Petitioner "was charging [other men] money for [the victim], for [her] body." She testified that the victim also "told [her] that [Petitioner]'s mother would give [the victim] shots. And [Flores] knew about the shots because [Petitioner's mother] herself told [Flores] about them." Flores further testified that "they threatened [the victim] with immigration, and that's how they kept her." On cross-examination, she admitted

that she had not noticed bruises or other signs of physical abuse on the victim on any previous occasion, despite having been around her frequently.

Morales similarly described seeing the victim "had been beat up" and observed "[b]ruises on her legs, her arms, [and a] punch in her head" when the victim arrived at her house with Flores in June 2008 and that the photographs she took that day, which the prosecution had admitted into evidence, accurately showed those injuries. She further testified that, when she had seen the victim at a park shortly before the victim sought her and Flores's assistance, the victim had seemed "nervous" and "paranoid," said she had "got problems with her boyfriend," and claimed to be being watched. On cross-examination, she acknowledged that she had not observed any injuries on the victim during their meeting in the park and did not see anyone watching them when the victim claimed to be being watched.

Like Flores and Morales, Sergeant Mulcahy testified that when he met the victim on June 17, 2008, he "observed bruising and swelling on her forehead, black and blue marks, scrape marks. She had bruising to her legs, both legs. In particular, her right leg was more severe[ly] bruis[ed], [with] an injury in the area of the knee cap." Sergeant Mulcahy also identified six photographs that he took of the victim's injuries that he observed that day. These photographs were admitted into evidence.

On cross-examination, Sergeant Mulcahy testified that the victim "described being kicked and beaten by [Petitioner] and threatened by him" when Mulcahy met her on June 17, 2008. Sergeant Mulcahy acknowledged that the victim had not described any instances of sexual assault to him until the SAIN interview in October 2008.[5]

On cross-examination defense counsel elicited from Mulcahy that he never sought to verify the information that the victim told him. Among that information, Mulcahy admitted that he included in his application for a warrant for Petitioner's arrest that

> [Petitioner] is a known admitted member and an extremely dangerous man, along with the fact that the victim has been placed in a safe house, coupled with the apparent escalating violence he exhibited [recently], [and thus Sergeant Mulcahy] believe[d] that if this individual is not arrested he will remain a serious threat to the [victim]'s well-being and safety

without taking any steps to verify any of those facts other than interviewing the victim.

---

[5] The court warned Petitioner's trial counsel that, by inquiring about the SAIN interview, he was opening the door to the Commonwealth's entering the video as an exhibit. Trial counsel stated that he "underst[ood]," and continued to question Sergeant Mulcahy about the interview. The video was later entered into evidence by the Commonwealth without objection from the defense.

Defense counsel adopted a strategy of cross-examining the victim and the prosecution witnesses. The defense did not present any witnesses. According to the MAC, "[Petitioner]'s mother [had] informed trial counsel that certain family members could provide testimony contradicting parts of the victim's testimony." According to an affidavit Petitioner filed in support of his later motion for a new trial, this testimony would have included "friends, family, neighbors and members of the community who knew [Petitioner], who knew [the victim] and who could testify as to the times that they had seen [the two] together as a couple."

Before the case was submitted to the jury, the Commonwealth alerted the court that it had not presented evidence showing that Petitioner had performed nonconsensual oral sex on the victim, as alleged by one of each of the rape and rape of a child counts,[6] and the court directed a verdict of not guilty on those counts. The jury then convicted Petitioner on the remaining counts on January 27, 2010. The court sentenced Petitioner to life imprisonment on two of the rape of a child counts, as well as lesser sentences on the other counts.[7]

---

[6] Two other counts -- one each of rape and rape of a child -- alleged that Petitioner had forced the victim to perform oral sex on him. Those counts were submitted to the jury, which convicted on both.

[7] One of the life sentences was later reduced to twenty-five years to twenty-five years and one day after a

- 15 -

Petitioner filed a motion for a new trial with the trial court on February 21, 2012, alleging that he had received ineffective assistance of counsel.[8]  Among other arguments, he asserted that his trial counsel had provided ineffective assistance by (1) failing to introduce pharmacy records purportedly showing that the victim was over the age of consent throughout her relationship with Petitioner, (2) introducing or failing to object to inadmissible evidence that purportedly harmed Petitioner's defense, and (3) failing to investigate potential defense witnesses.

Petitioner filed several affidavits in support of his motion for a new trial.  In his own affidavit, Petitioner stated that his mother had given his trial counsel pharmacy records showing the victim to have been born in 1987.

Rhina Cruz, Petitioner's sister-in-law and Moris Quintanilla's wife, also submitted an affidavit in support of Petitioner's new trial motion signed under the pains and penalties of perjury on October 12, 2011.  In it, Cruz stated she lived with

---

sentencing appeal to the state superior court's appellate division.

[8]    Petitioner also appealed his conviction to the MAC. The MAC stayed the appeal pending the trial court's ruling on his motion for a new trial, then consolidated the direct appeal with the appeal of the trial court's initial denial of his motion without a hearing.

Petitioner and the victim in the house along with her husband, Moris, Petitioner's brother. Cruz stated that "[the victim] joked a lot, and once she made a joke that she was going to use [Petitioner] to get her papers to stay in the United States. At the time I thought she was kidding, but now that conversation bothers me a lot."[9]

The trial court held a four-day evidentiary hearing on the motion in late 2013 and early 2014.[10] Petitioner presented eleven witnesses: ten fact witnesses -- three members of the victim's family, four members of Petitioner's family, one of Petitioner's family's neighbors, a family friend, and the family's landlord -- and one expert witness -- the criminal defense training director for the Committee for Public Counsel Services.

Cruz's testimony at Petitioner's new trial motion evidentiary hearing on January 27, 2014, was markedly different from her sworn statement in the October 2011 affidavit. At the evidentiary hearing Cruz testified that on a single occasion about 12 months before the victim escaped from Petitioner the victim

_____

[9] The victim had testified at trial that Moris, Cruz's husband and Petitioner's brother, was one of the individuals who had paid Petitioner to "touch" her "sexually" during her time living with Petitioner.

[10] The trial court initially denied the motion without a hearing. Petitioner appealed the denial to the MAC, which vacated the trial court's decision and remanded for an evidentiary hearing.

- 17 -

became angry at Petitioner and said that she would "make [Petitioner] eat shit" and "was going to get papers [to remain in the United States legally]" by "accus[ing] [Petitioner,] even if it was by lying." Cruz testified that at the time the victim made these statements Cruz "did not think she was saying this seriously."

At the evidentiary hearing Cruz admitted that she did not tell anyone about the victim's alleged statement at the time. Cruz admitted that she never "mention[ed] [this statement] again after that," including that she did not discuss the statement with Petitioner after he was charged even though they were still living together at that time. She also admitted that she never called the police to give them this information either. The trial judge extensively engaged in questioning of Cruz as to inconsistencies in her sworn statements and her failure to inform anyone at the time.

As the MAC summarized, "the witnesses [including Cruz] testified that the victim was treated like a member of the family, was free to leave the home as she pleased, and appeared to be happy in her relationship with [Petitioner]." Several of the witnesses testified that they had never observed any bruises on the victim or seen her hair cut unusually. Two of the victim's half-sisters testified that she had wanted to move in with Petitioner and had not been sold to his family. Each fact witness -- including Cruz

-- averred that he or she had not been contacted by Petitioner's trial counsel and would have been willing to testify if asked.

The expert witness testified to various deficiencies she perceived in Petitioner's trial counsel's performance, although she also stated that trial counsel's "theory could have been fine" if it were better executed.

The trial court denied Petitioner's motion for a new trial in a written order issued December 11, 2014, which included detailed factual findings and legal conclusions. The court found that trial counsel had not performed deficiently by failing to introduce the pharmacy records referenced in Petitioner's affidavit because, based on statements by trial counsel at trial, it concluded that trial counsel did not possess them. The court also concluded that trial counsel's introduction or failure to object to inadmissible testimony was generally part of a reasonable strategy to demonstrate the victim's lack of credibility by demonstrating inconsistencies in her allegations, and that any errors had not prejudiced Petitioner. And the court found Petitioner's fact witnesses largely incredible, and so reasoned that "trial counsel's decision not to call the defendant's relatives and friends was not manifestly unreasonable and did not give rise to a substantial risk of a miscarriage of justice" and thus "his failure to interview them [was] of no consequence." As to Cruz's testimony, the trial judge found, in full:

I do not credit [Cruz]'s testimony as to a statement that she claims [the victim] made to her. At all relevant times, [the victim] did not have documentation to be in the U.S. legally. [Cruz] claims that, approximately one year before [the victim] left [Petitioner's home] in 2008, while they were both getting ready to go to a party ([Petitioner] and [Cruz]'s husband Moris played in the same band), [the victim] was upset as she had wanted to leave with [Petitioner]. [Cruz] now claims that [the victim] said to her, "I'll make him eat shit; I'll get papers (to be in [the] U.S. legally) by accusing him even if I have to lie." [Cruz] claims that she immediately realized the seriousness of what [the victim] said but she did not think [the victim] meant it as she was just expressing her anger at this defendant. In ¶ 17 of her affidavit, [Cruz] asserted that "[the victim] joked a lot, and once she made a joke that she was going to use [Petitioner] to get her papers to stay in the United States. At the time I thought she was kidding, but now that conversation bothers me a lot." [Cruz]'s claim is incredible; that she has two different versions, one where [the victim] is joking and one where [the victim] is angry, is substantial evidence that her story is concocted and false.

When [Cruz] learned of the charges against [Petitioner] from [Petitioner's mother], including that he was charged with raping [the victim] she remembered what [the victim] allegedly told her the previous year. She wondered to herself how he could be charged with raping [the victim] when she had seen them so happy together. But she never went to the police, assistant district attorney or anyone, not even to [Petitioner]. [Cruz] also alleges that she told [Petitioner's mother], but never [Petitioner] what she alleges that [the victim] told her about fabricating against this defendant to get papers to legally be in [the] U.S. According to her, the only person she told of [the victim]'s

alleged statement was [Petitioner's mother]. For reasons she declined to explain, she preferred to tell [Petitioner's mother], and not to tell [Petitioner]. This alone confirms the level of control that [Petitioner's mother] has long exerted in that household, which, in part, corroborates the victim's testimony.

I do not credit [Cruz]'s testimony. She did not know even the street on which the factory where she allegedly works is located; she did not know even the time periods when she worked; she lied even about why she could not have testified earlier at this hearing (i.e., "I have to care for my child in the morning when he goes to kindergarten," and also that she could not have come to court in the afternoon when three of the hearings were scheduled). Most importantly, I do not accept that anyone knowing of this alleged statement by [the victim] would not tell everyone and anyone, defendant, his attorney, police, assistant district attorney, etc.[11]

The court also determined that, even if "the totality of trial counsel's errors" amounted to deficient performance, no prejudice had resulted.

Petitioner appealed to the MAC, where he raised the same arguments made to the trial judge. Specifically, he argued that defense counsel was ineffective for (1) failing to secure and

---

[11]     As to the family members, the trial judge did not credit their claims that the relationship between Petitioner and the victim was consensual, that the victim had at all times been an adult, and that they were unaware of the severity of the charges against Petitioner. Among other reasons, the court noted that the family failed to go the police after the arrest about what they now testified were charges that were false, when in contrast the family had indeed contacted the police in 2003 as to a much less serious matter.

introduce the allegedly exculpatory pharmacy records, (2) introducing or failing to object to "otherwise inadmissible and highly prejudicial evidence," and (3) failing to investigate potential "exculpatory" witnesses. Petitioner placed the record supporting the trial judge's credibility finding directly before the MAC by arguing that the trial judge erred "in denying [Petitioner]'s motion for new trial . . . largely because she did not find the witnesses credible."

The MAC affirmed in a "Memorandum and Order Pursuant to [MAC] Rule 1:28."[12] As part of that opinion, the MAC stated that

> [s]ummary decisions issued by the Appeals Court pursuant to its rule 1:28, as amended by 73 Mass. App. Ct. 1001 (2009), are primarily directed to the parties and, therefore, <u>may not fully address the facts of the case or the panel's decisional rationale</u>. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.

(Emphasis added and citations omitted.)

In its summary decision, the MAC expressly adopted the trial court's conclusion that trial counsel did not have the

---

[12] Rule 1:28 was superseded by Massachusetts Appeals Court Rule 23.0 effective July 1, 2020. Because Petitioner's course of state court litigation ended in May of 2018 (see below) we do not consider Rule 23.0.

pharmacy records and so did not perform deficiently by failing to introduce them. It also expressly concluded that trial counsel's decisions to introduce or not object to inadmissible evidence had reasonably advanced his "two-fold strategic plan to illustrate that . . . (1) the victim's testimony was not credible because her story had evolved over time and was incred[ible], and (2) the police investigation was incomplete and thus could not be trusted." Finally, the MAC expressly held that no prejudice had resulted to Petitioner because the testimony offered by the witnesses was cumulative of evidence presented at trial or "would have served [only] to impeach, which is 'not ordinarily the basis of a new trial.'"[13] (Quoting Commonwealth v. Almeida, 897 N.E.2d 14, 27 (Mass. 2008).)

The Massachusetts Supreme Judicial Court ("SJC") denied Petitioner's application for review of the MAC's decision in May 2018 without a written opinion.

## C.

On May 6, 2019, Petitioner filed a habeas petition challenging his convictions in the U.S. District Court for the District of Massachusetts. The petition reprised the ineffective assistance claims rejected by the trial court, MAC, and SJC.

---

[13] The MAC also expressly stated that trial counsel's failure to interview the potential witnesses proffered by Petitioner "fell short of [the investigation expected of an] ordinarily fallible lawyer."

Following briefing from Petitioner and the Commonwealth, the district court denied relief, reasoning that Petitioner had not shown that the state court decision rested on an unreasonable application of federal law or an unreasonable determination of the facts as required to obtain habeas relief under AEDPA. See Quintanilla, 2020 WL 1139882, at *4-7; see also 28 U.S.C. § 2254(d) (setting standard of review). But the court also concluded that "reasonable jurists could debate" the merits of Petitioner's claims, and so granted a certificate of appealability authorizing Petitioner to seek review in this court. Quintanilla, 2020 WL 1139882, at *7.

This appeal followed.

## II.

### A.

Because "'the district court undert[ook] no independent factfinding [and] we are effectively in the same position as the district court vis-à-vis the state court record,' our review of a district court's denial of [Petitioner's] habeas petition is de novo." Porter v. Coyne-Fague, 35 F.4th 68, 74 (1st Cir. 2022) (quoting Pike v. Guarino, 492 F.3d 61, 68 (1st Cir. 2007)). Our review of the state court decision is, in contrast, governed by AEDPA, which "demands that a federal habeas court measure a state court's decision on the merits against a series of 'peculiarly

deferential standards.'"[14]  Id. (quoting Cronin v. Comm'r of Prob.,
783 F.3d 47, 50 (1st Cir. 2015)).

We owe this deference to the decision reached by the last state court to hear Petitioner's claim for state law relief -- here, the SJC.  Because the SJC summarily denied Petitioner's request for further appellate review without stating its grounds for rejecting Petitioner's claims, we look to the last reasoned state court decision and presume it provides evidence of "the grounds for the higher court's decision."  Wilson v. Sellers, 138

---

[14]  In evaluating Petitioner's ineffective assistance of counsel claims, the MAC employed the state law standard established in Commonwealth v. Saferian, 315 N.E.2d 878 (Mass. 1974), rather than citing federal precedents applying Strickland v. Washington, 466 U.S. 668 (1984).  As Petitioner properly concedes, this reliance on Massachusetts caselaw does not affect our standard of review.  "A state court decision applying state law deserves deference under AEDPA 'as long as the state and federal issues are for all practical purposes synonymous and the state standard is at least as protective of the [petitioner]'s rights.'"  Strickland v. Goguen, 3 F.4th 45, 54 n.14 (1st Cir. 2021) (quoting Scott v. Gelb, 810 F.3d 94, 99 (1st Cir. 2016)). This court has confirmed that the Saferian standard is at least as protective as, and functionally equivalent to, the Strickland standard and that AEDPA deference is appropriate in reviewing Massachusetts decisions applying Saferian.  See id.

We note that Petitioner, in the "summary of argument" section of his opening brief, asserts that "the standard of review employed by Massachusetts was wrong . . . , [and so] this court [should] address[] the question of prejudice de novo."  However, his brief never elaborates on this assertion or otherwise develops an argument for de novo review, and so any such argument is waived. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

S. Ct. 1188, 1196 (2018).  Here, this presumption requires us to first look to the MAC's decision affirming the trial court's denial of Petitioner's motion for a new trial for the likely grounds on which the SJC denied further review of his claim.

Specifically, 28 U.S.C. § 2254(d) provides that "a writ of habeas corpus . . . shall not be granted unless" the state court decision either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See, e.g., Field, 37 F.4th at 16-17 (discussing this provision).

The first of these two bases for granting habeas relief -- subsection (d)(1) -- itself "splits into two distinct avenues for relief: the 'contrary to' clause and the 'unreasonable application' clause."  Porter, 35 F.4th at 74 (quoting 28 U.S.C. § 2254(d)(1)).  "The 'contrary to' clause applies when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'"  Id. (alterations in original) (quoting Williams v. Taylor, 529 U.S. 362, 412-13

(2000)).  Petitioner does not develop any argument that he is entitled to relief under this clause.

The second, "unreasonable application" clause of subsection (d)(1) "applies when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner]'s case.'"  Id. (first alteration in original) (quoting Williams, 529 U.S. at 413).  For relief to be appropriate under this clause, the state court's application of Supreme Court caselaw "must be objectively unreasonable, not merely wrong; even clear error will not [necessarily] suffice."  Id. at 75 (quoting White v. Woodall, 572 U.S. 415, 419 (2014)); see also Harrington v. Richter, 562 U.S. 86, 102 (2011) (explaining that "this standard . . . was meant to be" "difficult to meet").  "[T]he 'unreasonable application' clause applies 'if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question.'"  Porter, 35 F.4th at 75 (internal quotation marks omitted) (quoting White, 572 U.S. at 427).  Further, "'evaluating whether a rule application was unreasonable requires considering the rule's specificity,' such that '[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'"  Id. (alteration in original) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  And even "[i]f

the petitioner does succeed in demonstrating error, 'it is still not enough to win because [he] must also illustrate actual prejudice resulted from the mistake.'" Field, 37 F.4th at 16 (internal quotation marks omitted) (quoting Goguen, 3 F.4th at 54).

The other path to habeas relief under AEDPA, subsection (d)(2), requires "a showing that the state court decision 'was based on an unreasonable determination of the facts' on the record before that court." Porter, 35 F.4th at 75 (quoting 28 U.S.C. § 2254(d)(2)). "This demanding showing cannot be made when '[r]easonable minds reviewing the record might disagree about the finding in question.'" Id. (alteration in original) (internal quotation marks omitted) (quoting Brumfield v. Cain, 576 U.S. 305, 314 (2015)). Notably, the next subsection of AEDPA, 28 U.S.C. § 2254(e)(1), further provides that "a determination of a factual issue made by a State court shall be presumed to be correct' unless rebutted 'by clear and convincing evidence.'" Porter, 35 F.4th at 79 (quoting 28 U.S.C. § 2254(e)(1)). "The Supreme Court has carefully left . . . open" the question of how subsections (d)(2) and (e)(1) fit together, and "the question remains open in this circuit" as well. Id. We need not resolve the question to decide this case.

**B.**

Under <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668 (1984), "[t]o succeed in his claim of ineffective assistance of counsel, [Petitioner] 'must show both deficient performance by counsel and resulting prejudice.'" <u>Thompson</u> v. <u>United States</u>, 64 F.4th 412, 421 (1st Cir. 2023) (quoting <u>Tevlin</u> v. <u>Spencer</u>, 621 F.3d 59, 66 (1st Cir. 2010)); <u>see</u> <u>Strickland</u>, 466 U.S. at 687.

To establish deficient performance, Petitioner must "establish that his 'counsel's representation fell below an objective standard of reasonableness.'" <u>Thompson</u>, 64 F.4th at 421 (internal quotation marks omitted) (quoting <u>Tevlin</u>, 621 F.3d at 66). "Review of counsel's performance must be deferential, and reasonableness must be considered in light of prevailing professional norms," mindful of the fact that "[t]here are countless ways to provide effective assistance in any given case." <u>Id.</u> (internal quotation marks omitted) (first quoting <u>Tevlin</u>, 621 F.3d at 66; and then quoting <u>Strickland</u>, 466 U.S. at 689). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." <u>Harrington</u>, 562 U.S. at 104 (quoting <u>Strickland</u>, 466 U.S. at 689). Ultimately, "[a]n attorney's performance is deficient . . . only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it."

Thompson, 64 F.4th at 421 (alteration and omission in original) (internal quotation marks omitted) (quoting Vargas-De Jesús v. United States, 813 F.3d 414, 417-18 (1st Cir. 2016)). The inquiry is objective: "Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." Harrington, 562 U.S. at 110; accord Wilder v. United States, 806 F.3d 653, 660 (1st Cir. 2015).

To show prejudice, Petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Harrington, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 694). "[S]how[ing] that the errors had some conceivable effect on the outcome of the proceeding" is insufficient; instead, Petitioner must establish that the errors were "so serious as to [have] deprive[d] [him] of a fair trial, a trial whose result is reliable." Id. (quoting Strickland, 466 U.S. at 687, 693). While this standard "does not require a showing that counsel's actions 'more likely than not altered the outcome,' . . . . [t]he likelihood of a different result must be substantial, not just conceivable." Id. at 112-13 (quoting Strickland, 466 U.S. at 693).

"[B]oth the [deficiency] and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact,"

rather than pure factual determinations, Strickland, 466 U.S. at 698, and so, barring any underlying factual disputes, the MAC's conclusion as to each prong "is evaluated under the 'unreasonable application' clause of § 2254(d)," Yeboah-Sefah, 556 F.3d at 70; accord Field, 37 F.4th at 16 n.1. The Supreme Court has emphasized that, while "'[s]urmounting Strickland's high bar is never an easy task[,]' . . . [e]stablishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Harrington, 562 U.S. at 105 (quoting Padilla v. Kentucky, 559 U.S. 356, 371 (2010)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Id. (citations omitted) (first quoting both Strickland, 466 U.S. at 689, and Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997); and then quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). In addition, because "[t]he Strickland standard is a general one, . . . the range of reasonable applications is substantial." Id. With respect to the deficiency prong in particular, "[f]ederal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether [Petitioner's trial] counsel's actions were reasonable. The question is whether there is any reasonable argument that [his trial] counsel satisfied Strickland's deferential standard." Id.

On appeal, Petitioner raises three arguments considered and rejected by the state courts, asserting that his trial counsel was ineffective because he (1) failed to introduce pharmacy records purportedly showing that the victim was over the age of consent throughout her relationship with Petitioner, (2) introduced or failed to object to inadmissible evidence that purportedly harmed Petitioner's defense, and (3) failed to investigate potential defense witnesses. Applying the deferential standard of review required by AEDPA and our presumption that the SJC denied Petitioner's request for further appellate review on the basis of the grounds stated in the MAC decision, we conclude that the MAC's decision -- and thus the SJC's summary denial of Petitioner's request for further review -- was not unreasonable as to the claims concerning the pharmacy records and inadmissible evidence.

For the claim concerning the uncalled defense witnesses, we evaluate Petitioner's trial counsel's failure to investigate Rhina Cruz separately from his trial counsel's failure to investigate the other witnesses. We hold that the MAC's decision was not an "unreasonable application" of Strickland as to Petitioner's claim that his trial counsel's failure to investigate the non-Cruz witnesses prejudiced him. As for Petitioner's claim that his trial counsel's failure to investigate Rhina Cruz prejudiced him because Cruz would have testified that she heard

the victim say that she would falsely accuse Petitioner, we do not decide whether the MAC's resolution of that claim was an "unreasonable application" under 28 U.S.C. § 2254(d)(1). We instead conclude that Petitioner's challenge as it relates to that argument fails because under our circuit precedent we presume correct the trial court's finding that this testimony was not credible, and Petitioner has failed to rebut that presumption.

## A.

We first address Petitioner's argument that the MAC unreasonably concluded that his trial counsel was not ineffective for failing to introduce pharmacy records purportedly showing that the victim was above the age of consent throughout her relationship with Petitioner. Petitioner asserts that his mother provided these records to his trial counsel before trial; that a competent lawyer would have offered the records to prove the victim's age or, at minimum, to impeach the victim's testimony that she was underage; and that failure to offer the records prejudiced his defense on the rape of a child charges, a necessary element of which was that the victim was underage. Relying on a statement by Petitioner's trial counsel to the trial court, the MAC affirmed the state trial court's finding that trial counsel did not have the records. Importantly, Petitioner does not argue that, if this factual finding was correct, his trial counsel was deficient for failing to independently discover and introduce the records, and so his

claim necessarily fails unless we conclude that the finding was erroneous.

As described above, two AEDPA provisions potentially bear on our review of the state courts' factual findings. Section 2254(d)(2) authorizes habeas relief where the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Section 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner rebuts that presumption "by clear and convincing evidence." We need not decide which of these provisions is controlling here because Petitioner's claim fails under either one.

Petitioner bases his argument on an affidavit he submitted with his motion for a new trial in which he stated: "[The victim's] birthday is March 25, 1987[,] and my mother gave my attorney prescriptions from Rite Aid and Brooks Pharmacy listing both [the victim's] date of birth and her doctor's name. . . . I trusted that my attorney would follow-up on all of this information." Petitioner's mother did not submit an affidavit or testify at the new trial hearing.

The state trial court and the MAC rejected Petitioner's claim that his trial counsel possessed the pharmacy records based

on a statement by his trial counsel during a pretrial discussion with the trial court and prosecutor that:

> In this case, Your Honor, to my knowledge, there's been no discovery produced whatsoever, whatsoever, that would objectively and independently verify the complainant's age. There is nothing.  The only documents I have are, for example, a medical form where someone handwrites a date of birth, and the date of birth is obtained -- and this I will find out through testimony of course -- that it's obtained through the complainant's own voluntary statement.[15]  There are no passports.  There's no licenses.  There's nothing whatsoever -- no school record -- nothing whatsoever to verify one way or the other the complainant's age.

Petitioner argues that this statement shows only that his trial counsel did not receive the pharmacy records "in discovery" from the Commonwealth and says nothing about whether he received them from Petitioner's mother.  That is, arguably, one plausible reading of the statement.  But it is at least equally plausible to take trial counsel's categorical statement that "[t]here is nothing" independently verifying the victim's age, his description of "[t]he only documents I have," and his reiteration that "[t]here's nothing whatsoever . . . to verify . . . the complainant's age" at face value as describing the information

---

[15]    Petitioner does not contend that this reference to "handwrit[ten]" "medical records" could refer to the pharmacy records, nor could he plausibly do so; the pharmacy records are typed, not handwritten, and trial counsel's statement implies that the handwritten records supported the victim's claim to have been underage, rather than contradicting it.

available from any source, rather than understanding them to be limited by the earlier reference to discovery. And, given that reading, we cannot say the state courts, confronted with two competing claims, acted unreasonably by crediting trial counsel's statement over Petitioner's.[16] At most, Petitioner has shown that "[r]easonable minds reviewing the record might disagree about the finding in question," Porter, 35 F.4th at 75 (alteration in original) (internal quotation marks omitted) (quoting Brumfield, 576 U.S. at 314), and that showing is insufficient to establish that the MAC's decision "was based on an unreasonable determination of the facts" so as to warrant relief under § 2254(d)(2). For the same reasons, Petitioner has not shown this factual finding to be erroneous "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Because Petitioner does not argue that his trial counsel was deficient for failing to discover and offer the pharmacy records if he did not have them, this conclusion defeats the ineffective assistance claim based on the pharmacy records. See, e.g., Thompson, 64 F.4th at 424 (explaining that failure to show deficiency defeats ineffective assistance claim). We thus need

_____

[16] Petitioner does not develop any argument that it was erroneous for the state courts to credit trial counsel's statement over his affidavit based on the fact that the latter was offered under penalty of perjury, and has thus waived any such argument. See, e.g., Zannino, 895 F.2d at 17.

- 36 -

not address the other arguments the parties advance concerning the records.

## B.

We turn to Petitioner's argument that the MAC unreasonably determined that his trial counsel did not provide ineffective assistance in either introducing or failing to object to inadmissible evidence that purportedly harmed Petitioner's defense. The MAC concluded that Petitioner's trial counsel did not perform deficiently in this respect because he had reasonably pursued a "two-fold strategic plan to illustrate that . . . (1) the victim's testimony was not credible because her story had evolved over time and was incred[ible], and (2) the police investigation was incomplete and thus could not be trusted." We conclude that Petitioner has not shown, "[u]nder the doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard," Knowles, 556 U.S. at 123, that the MAC's conclusion "involved an unreasonable application of . . . established Federal law" warranting habeas relief, 28 U.S.C. § 2254(d)(1).

As a threshold matter, Petitioner argues that the MAC committed an error of law by purportedly failing to examine whether his trial counsel's actions were objectively reasonable; he asserts that the court instead evaluated only whether his trial counsel subjectively believed his actions to be strategic. See

Harrington, 562 U.S. at 110 ("Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."). A fair reading of the MAC's opinion rebuts this argument. That court did note that Petitioner's trial counsel had "repeatedly confirmed" that at least some of his decisions at trial were "deliberate and tactical." But it also discussed trial counsel's success in using the evidence he elicited or to which he did not object to "establish[] that the victim's story evolved from the defendant's physical abuse alone to daily sexual abuse," affirmed that the trial court had not "abuse[d] [its] discretion in finding that [trial counsel's] strategy was not 'manifestly unreasonable,'" and cited case law observing that an ineffective assistance claim must fail "where [the] 'challenged conduct reflects the arguably reasoned tactical or strategic judgments of a lawyer.'" Id. (emphasis added) (first quoting Commonwealth v. Finstein, 687 N.E.2d 638, 640 (Mass. 1997); and then quoting Commonwealth v. McCormick, 717 N.E.2d 1029, 1031 (Mass. App. Ct. 1999)). We conclude that the MAC did evaluate the objective reasonableness of Petitioner's trial counsel's performance, as required by Strickland.[17]

_____

[17] Petitioner also contends that the MAC erroneously "attributed [to his trial counsel] a trial strategy that trial counsel himself never claimed or stated." "Although courts may

- 38 -

Petitioner cites several instances in which he alleges his trial counsel performed deficiently. Because the MAC rejected his arguments, under AEDPA, "[t]he question [in each instance] is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 562 U.S. at 105. In other words, we can grant habeas relief only if "there could be no fairminded disagreement," Porter, 35 F.4th at 75 (internal quotation marks omitted) (quoting White, 572 U.S. at 427), that "counsel's choice[s] [were] so patently unreasonable that no competent attorney would have made [them]," Thompson, 64 F.4th at 421 (quoting Vargas-De Jesús, 813 F.3d at 418). None of the alleged errors cited by Petitioner satisfy that standard.

Petitioner points first to trial counsel's decision to introduce, during cross-examination of Sergeant Mulcahy, a police report prepared by Sergeant Mulcahy after the victim first contacted the police in June 2008 that stated:

> Given the fact that this individual is a known admitted [gang] member and an extremely dangerous man, along with the fact that the

not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." Harrington, 562 U.S. at 109 (citation omitted) (quoting Wiggins v. Smith, 539 U.S. 510, 526 (2003)). The fact that Petitioner's trial counsel did not explicitly describe each component of his strategy on the record does not render his performance deficient.

> victim has been placed in a safe house, coupled with the apparent escalating violence he exhibited on Sunday night, I believe that if this individual is not arrested he will remain a serious threat to the plaintiff's well-being and safety. I am also concerned with flight risk because the individual has the means and support system in El Salvador to avoid prosecution in this matter.

Petitioner argues that his trial counsel behaved unreasonably in introducing this statement because it was hearsay that the Commonwealth would have been unable to introduce against him and because the allegation that he belonged to a gang would likely turn the jury against him.

The MAC rejected this argument, reasoning that trial counsel had acted reasonably in service of "his theory that the police investigation was lackluster." That holding was not objectively unreasonable. This court has acknowledged that "poking holes in the police investigation" can constitute a "plausible trial strategy." Janosky v. St. Amand, 594 F.3d 39, 48 (1st Cir. 2010) (holding that MAC's conclusion that habeas petitioner's counsel did not act deficiently by introducing "potentially damaging [hearsay] testimony" in attempt to discredit police investigation was not unreasonable). As the MAC noted, after introducing the report, trial counsel elicited testimony from Sergeant Mulcahy establishing that all of the allegations in the report, including Petitioner's alleged gang membership, were based solely on the victim's statements and that Sergeant Mulcahy

had taken no steps to independently verify any of them, whether before filing the report or thereafter. For instance, trial counsel elicited that Sergeant Mulcahy never even attempted to interview Petitioner. "To be sure, [this] strategy was not free from risk," Janosky, 594 F.3d at 48, but Petitioner's trial counsel effectively cross-examined Sergeant Mulcahy about the basis for the report, and it is not beyond fairminded dispute that at least some competent lawyers might similarly risk introducing the reference to gang membership in an attempt to show that the authorities credited the victim's allegations without a proper investigation and that at least some of those allegations lacked support beyond the victim's word.

Petitioner similarly cannot show an entitlement to relief based on his trial counsel's decision to elicit testimony that the victim had "sought and obtained a restraining order" against Petitioner after reporting the abuse to police. While Petitioner contends that the evidence of the restraining order "len[t] credence to the [victim]'s claims by showing that a court ha[d] validated her allegations of abuse," Petitioner's trial counsel used the evidence in such a way that it was not unreasonable for the MAC to conclude that this risk was justified and his actions did not "amount[] to incompetence." Harrington, 562 U.S. at 105. Petitioner's trial counsel elicited -- or stated that he intended to elicit, but for the fact that the prosecution

did so first -- testimony showing that the victim made multiple calls to Petitioner after obtaining the restraining order. Trial counsel referenced this fact in both his opening statement and his closing argument. This evidence supported the defense that the victim's accusations were not credible, implying that she had taken out a restraining order against Petitioner despite apparently being unafraid of contacting him and that she might similarly have pursued the criminal charges on a fraudulent basis, such as to secure a U visa. Cf. Janosky, 594 F.3d at 48 ("When . . . counsel's decision to elicit potentially damaging testimony is part of a plausible trial strategy, that decision does not fall below an objective standard of reasonableness."). Because "there is [at least a] reasonable argument" that Petitioner's trial counsel's actions fell "within the 'wide range' of reasonable professional assistance," we must defer to the MAC's determination that he did not perform deficiently. Harrington, 562 U.S. at 104-05 (quoting Strickland, 466 U.S. at 689).

Petitioner also cites to his trial counsel's decision to introduce, or fail to object to the Commonwealth's introduction of, hearsay statements by the victim describing abuse by Petitioner or his family. These statements took the forms of a video of the victim's SAIN interview from October 2008 and of testimony by Flores, Morales, and Sergeant Mulcahy recounting statements by the victim. We conclude that it was not objectively unreasonable for

the MAC to conclude that a competent defense attorney might embrace these statements' admission as bolstering the defense's theories that the victim's allegations were unreliable or fabricated, both because they had evolved over time and because they were incredibly extreme, and that the police's investigation had been inadequate.

Contrary to Petitioner's assertion that the hearsay statements did not "show[] any inconsistencies in [the victim's] stories," the MAC accurately observed that "[t]aken together, this evidence established that the victim's story evolved from the defendant's physical abuse alone to daily sexual abuse." Id. Both Flores and Sergeant Mulcahy described the allegations of physical abuse the victim made in June 2008 and acknowledged that she did not allege any sexual abuse at that time.[18] Testimony from Flores about her conversations with the victim and from Sergeant Mulcahy about the SAIN interview showed that the victim did not allege any sexual abuse until later: Flores testified that the victim did not describe any sexual abuse to her until a phone call that took place after the victim had obtained a restraining order and left

---

[18] Morales similarly testified that, while the victim had told her in June 2008 that "she got problems with her boyfriend," the victim did not describe the problems in any detail or specify that Petitioner had committed any sexual abuse.

Petitioner's home.[19]  Sergeant Mulcahy testified that the victim did not report any sexual abuse to law enforcement until the SAIN interview on October 31, 2008, more than four months after she first contacted the police.  Particularly when combined with other testimony elicited by Petitioner's trial counsel establishing that the victim had had earlier opportunities to seek help (for instance, by using the phone in Petitioner's home or during the time she spent outside the home) but did not do so, the evidence to which Petitioner now objects showed that the victim's allegations evolved dramatically over time, from years without any allegations, to claims of physical abuse, to accusations of sexual abuse.  Cf. Tang v. Citizens Bank, N.A., 821 F.3d 206, 216 (1st Cir. 2016) (observing that the fact that a witness's "testimony . . . has grown more elaborate with time . . . may render her an easily impeachable witness").

The hearsay evidence also provided valuable impeachment material by highlighting the extreme and unsupported nature of some of the victim's allegations.  Trial counsel established that, during the SAIN interview, the victim accused Petitioner's mother of practicing witchcraft against her.  And, through cross-examination of Morales, he elicited that, at a time when the victim

---

[19]    Flores's testimony similarly established that the victim did not report receiving shots from Petitioner's mother until this later call.

had told Morales she was being watched from a window, Morales did not see anyone there.[20]

In addition, trial counsel used the SAIN evidence to further challenge the adequacy of the police's investigation. For example, he elicited testimony from Sergeant Mulcahy that, although the victim mentioned during the interview that she had a stepmother who lived and owned a shop in the area and who had sometimes given the victim money to pass on to Petitioner's family, Sergeant Mulcahy never sought to contact the stepmother.

---

[20] In his brief, Petitioner asserts that Flores also testified that the victim "told [her] [Petitioner]'s family members [were] always watching her." In the cited testimony, Flores actually stated that Petitioner's mother had told her that the family was always watching the victim. As Petitioner observes elsewhere in his brief, trial counsel admitted during a sidebar conference that his failure to object to that testimony had been an oversight. The MAC acknowledged that the failure to object was a "mistake," but held that that lapse was insufficient to render trial counsel's performance deficient. In this court, Petitioner does not address that holding or develop an argument that this purported error, standing alone, rendered his trial counsel's performance deficient. Cf. Harrington, 562 U.S. at 111 ("[W]hile in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." (citation omitted) (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986))). We note that, while Petitioner's brief implies that his trial counsel stated that his failure to object to all hearsay testimony offered by Flores had been an error, the record shows that trial counsel specified that he deliberately did not object to most of Flores's testimony and that only his failure to object to that one element of her testimony was unintentional.

At minimum, "fairminded" jurists could disagree as to whether these benefits to the defense outweighed the risk, cited by Petitioner in his brief, that this hearsay evidence would bolster the victim's credibility by having her allegations repeated to the jury by multiple witnesses or through the SAIN video. Porter, 34 F.4th at 75 (quoting White, 572 U.S. at 427). And where such "fairminded disagreement" could exist, AEDPA forbids habeas relief. Id. (quoting White, 572 U.S. at 427).

Petitioner contends that, because his trial counsel objected to the SAIN video's being played for the jury prior to closing arguments, the MAC erred in concluding that the admission of the video was a strategic decision. This argument fails as a factual matter, even assuming trial counsel's actual thinking is relevant to the deficiency inquiry. See Harrington, 562 U.S. at 109-10 ("Although courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . Strickland . . . calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (quoting Wiggins v. Smith, 539 U.S. 510, 526 (2003))). Trial counsel objected to the video's being played in full prior to closing arguments, but in so doing reiterated to the court that he did not object to the video's admission as an exhibit, simply to the timing of its presentation. There is no necessary contradiction in trial

counsel's believing that the video was, on balance, helpful to the defense for the reasons described above but that its playing to the jury in full shortly before their deliberations would be beneficial to the prosecution.

Finally, we reject Petitioner's argument that the MAC made an erroneous factual finding in stating that "while [Petitioner's] expert witness disagreed with particular tactical decisions, she concluded that his general strategy was not unreasonable." That statement was supported by the record. Petitioner's expert stated that trial counsel's "theory could have been fine" and agreed, for example, that "a reasonable strategy for a defendant might be to suggest to the jury that the police did not do their job properly." Certainly, as the MAC acknowledged, Petitioner's expert witness also made clear her belief that trial counsel had not executed his strategy proficiently, but that fact does not render the MAC's statement as to trial counsel's general strategy untrue. Nor does Petitioner's expert's view that she would have used the evidence differently make the MAC's conclusion as to deficiency unreasonable. See, e.g., Strickland, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.").

## C.

Petitioner's last challenge is to the MAC's holding that though his trial counsel was deficient in not interviewing certain potential witnesses, he nonetheless had not shown the prejudice needed to establish ineffective assistance of counsel.[21] We conclude that Petitioner's challenge as to almost all of the evidence pertaining to these uncalled witnesses fails because the MAC's lack-of-prejudice ruling concerning that evidence was not an "unreasonable application" of Strickland under 28 U.S.C. § 2254(d)(1). We further conclude that Petitioner's challenge based on Rhina Cruz's testimony at the new trial hearing fails. In her testimony, which the motion judge rejected as not credible,[22] Cruz said she heard the victim say she "was going to get papers [to remain in the United States legally]" by "accus[ing]

_____

[21]    The MAC concluded that trial counsel's failure to interview these potential witnesses "fell short of [the investigation expected] of [an] ordinary fallible lawyer," and the district court "agree[d]" that trial counsel's performance was deficient, Quintanilla, 2020 WL 1139882, at *5. Although the Commonwealth asserts that we are "not bound by the [MAC's] finding of deficient performance," it does not develop any argument as to why that conclusion was erroneous. Because we conclude that the MAC's lack-of-prejudice holding was reasonable, we need not address deficiency. See, e.g., Strickland, 466 U.S. at 687, 697 (explaining that both deficiency and prejudice are required and that courts need not address one prong if the defendant has not satisfied the other).

[22]    As noted, the judge for Petitioner's new trial motion was the same judge who presided over the jury trial that resulted in Petitioner's convictions.

[Petitioner] even if it was by lying." We presume this factual finding as to the credibility of this testimony was correct, and Petitioner has not carried his burden to rebut that presumption. See Yeboah-Sefah, 556 F.3d at 80; Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007).

We begin with the challenge that concerns all the uncalled witnesses other than Cruz. The MAC expressly stated that the testimony these witnesses would have offered would have been either cumulative of evidence already presented at trial or useful only for impeachment. Id. Petitioner argues that this characterization of the evidence was erroneous and that, even if it were accurate, the impeachment evidence would have been sufficiently valuable to his defense as to create the reasonable probability of a different result required to establish prejudice under Strickland.[23] See 466 U.S. at 694. Based on the testimony cited by Petitioner and the arguments he advances as to its usefulness, we cannot say the MAC mischaracterized the evidence's uses or reached an unreasonable conclusion as to prejudice.

---

[23] At oral argument and in a letter filed after argument, Petitioner argued that the witnesses testified that they believed the victim to be above the age of consent throughout the time she lived with Petitioner and that this evidence would have supported his defense on the rape of a child counts. Petitioner did not make this argument in his opening or even his reply brief, and so it is waived. See, e.g., Lowe v. Mills, 68 F.4th 706, 719 n.16 (1st Cir. 2023).

Ineffective assistance claims under AEDPA "where the relevant error is failure to impeach a government witness" requires us to "begin [the prejudice analysis] by assessing the strength of the prosecution's case, and the effectiveness of the defense absent the impeachment evidence." Malone v. Clarke, 536 F.3d 54, 64 (1st Cir. 2008) (quoting Stephens v. Hall, 294 F.3d 210, 218 (1st Cir. 2002)). We must "then consider 'the potential impeachment value of the evidence in undermining the credibility of the witness's testimony.'" Id. (internal quotation marks omitted) (quoting Stephens, 294 F.3d at 218). Under the double deference required by AEDPA, Petitioner must prove that the MAC unreasonably weighed the prosecution's case, effectiveness of the defense absent the impeachment evidence, and potential impeachment value of the uncalled witnesses' testimonies.

Petitioner first cites the fact that several of the uninterviewed witnesses, including members and friends of Petitioner's family, testified at the new trial hearing that they never saw any bruises on the victim or observed that her hair was cut in a "weird way." The MAC determined that this evidence was merely cumulative of the testimony which trial counsel had elicited on cross-examination from prosecution witnesses Flores and Morales. Flores acknowledged that she never saw any "bruises, scratches, fractures, [or] any [other] type of physical abuse" in any of her interactions with the victim prior to the day in June

- 50 -

2018 when the victim sought her assistance. Morales, too, testified that she had not seen any "scratches," "marks," "bumps," or "bruising" on the victim during a meeting shortly before that day. It was not objectively unreasonable of the MAC to conclude that similar testimony, particularly by those affiliated with Petitioner by family or friendship, would not have affected the outcome. Cf. Stephens, 294 F.3d at 225-26 (concluding that state court's decision that failure to offer impeachment evidence did not prejudice defendant was not objectively unreasonable where the evidence arguably "added nothing new").

Further, the Commonwealth produced strong evidence and exhibits, independent of the victim's testimony, in support of the allegations of physical abuse: two sets of photographs showing bruising on the victim's face and legs and her hair cut short, as well as the testimony from Flores, Morales, and Sergeant Mulcahy that they had observed those injuries. The MAC reasonably concluded that trial counsel's failure to offer testimony that the victim had not displayed these injuries on earlier occasions did not prejudice Petitioner. Cf., e.g., Turner v. United States, 699 F.3d 578, 584 (1st Cir. 2012) (noting that prosecution's presentation of "strong evidence of guilt" reduces likelihood of Strickland prejudice).

Petitioner also argues that two of the victim's half-sisters testified that the victim had wanted to move in with

Petitioner and that the victim's father had not sold her to Petitioner's family. Petitioner asserts that this testimony contradicted the victim's testimony that she did not want to move in with Petitioner and that she understood her father to have sold her to Petitioner for $100. These arguments fail for the same reasons stated above.

We conclude that the MAC did not unreasonably conclude that no prejudice resulted from the failure to present the additional impeachment evidence proffered by those uninterviewed witnesses who did not testify that they heard the victim state an intention to falsely accuse Petitioner. Cf. Malone, 536 F.3d at 67 ("Although we have noted that 'a significant factor weighing in favor of finding prejudice is the absence of any corroborating evidence other than the testimony of the witness whom defense counsel failed to impeach,' here, defense counsel did not fail to impeach [the victim-witness]." (citation omitted) (quoting Stephens, 294 F.3d at 225)).

We now turn to the challenge that relies on Rhina Cruz's testimony, rejected by the motion judge as not credible, that Cruz heard the victim state an intention to falsely accuse Petitioner. We note that although the state trial court expressly found Cruz's testimony "incredible," the MAC did not expressly refer to this testimony by Cruz, and Petitioner contends that the MAC did not adopt the trial court's credibility findings. The MAC opinion

did, however, expressly point out that it was a summary opinion that "may not fully address the facts of the case or the panel's decisional rationale."

Even were we hypothetically to conclude that the MAC did not in its summary decision adopt the credibility finding or that the MAC made an "unreasonable application" of Strickland under 28 U.S.C. § 2254(d)(1), we presume the correctness of the state trial court's adverse credibility finding as to Cruz. See Yeboah-Sefah, 556 F.3d at 80. Petitioner argues, referring to a Sixth Circuit case, that he has no burden to rebut this presumption.[24] As a matter of law this court rejects that argument. We have repeatedly held that federal habeas courts must give a presumption of correctness to state-court findings of "'basic, primary, or historical facts,' such as witness credibility." Sleeper, 510 F.3d at 38 (quoting Sanna v. DiPaolo, 265 F.3d 1, 7 (1st Cir. 2001)); see also Ayala v. Alves, 2023 WL 7013413, at *17, *19 (1st Cir. Oct. 25, 2023) (applying this presumption as to state court factual findings). Even had Petitioner made some effort to argue this point, the record does not support the conclusion that Petitioner has rebutted this presumption.

---

[24] Petitioner cites only to a sixteen-year-old Sixth Circuit opinion, Ramonez v. Berhuis, 490 F.3d 482, 490-91 (6th Cir. 2007), and does not develop an argument as to how it comports with our own circuit precedent. See Zannino, 895 F.2d at 17.

- 53 -

Cruz, who was Petitioner's sister-in-law, made two sworn statements in support of his new trial motion, one of which Petitioner ignores but which the motion judge did not. In an affidavit dated October 12, 2011, Cruz stated that "[the victim] joked a lot, and once she made a joke that she was going to use [Petitioner] to get her papers to stay in the United States. At the time I thought she was kidding, but now that conversation bothers me a lot."

The motion judge held that Cruz -- who was dependent on Petitioner's family and lived with him, and who was married to Petitioner's brother, Moris -- changed her story when she testified before the motion judge in January 2014, over six years after the victim allegedly made the statement she described.[25] In that sworn testimony, Cruz testified -- for the first time and inconsistently with her prior affidavit, as the motion judge found -- that the victim had become angry with Petitioner over a disagreement related to the band they performed in. Cruz testified that the victim stated she would "make [Petitioner] eat shit" and "was going to get papers [to remain in the United States legally]" by "accus[ing] [Petitioner] even if it was by lying." Cruz further testified that she "did not think [at the time] that [the victim] was saying

---

[25] This six year gap further supports the trial judge's finding that Cruz's later testimony was incredible.

this seriously." Petitioner contends that this latter testimony would have revealed the victim's "motive to fabricate."

The record shows that the motion judge, before making any credibility finding, undertook extensive questioning of Cruz. The motion judge held that Cruz's testimony was not credible because Cruz failed to tell anyone of the victim's alleged statement about the victim's intention to lie and had no satisfactory explanation for her failure to do so; failed, in a number of instances, to recall matters most people would recall, including, for example, the address of the factory where she worked and the time periods in which she generally worked there; and was dependent on Petitioner's family and was indeed a close member of Petitioner's family as his sister-in-law. The motion judge explicitly found that Cruz had lied during her testimony.

Petitioner has not rebutted the presumption of correctness that AEDPA requires us to give to that factual determination.

**IV.**

We affirm.